COMMONWEALTH *vs.* ROBERT J. O'BRIEN & another.

Suffolk.    April 6, 1971. — June 30, 1971.

Present: TAURO, C.J., CUTTER, REARDON, QUIRICO, & BRAUCHER, JJ.

*Evidence,* State's evidence. *Practice, Criminal,* Mistrial, Unsworn statement by defendant. *Constitutional Law,* Confrontation of witnesses.

At the trial of indictments against four defendants, there was no error in permitting two defendants to testify during the Commonwealth's case in chief at their request subject to a general explanation of their rights and individual inquiry by the judge of their understanding thereof and motives for testifying. [45–47]

There was no error or prejudicial harm in the denial in criminal cases of a motion for a mistrial by one of the defendants based on the ground that refusals by a codefendant who testified in his own behalf and admitted his involvement in the crimes to discuss the movant at all denied the movant his constitutional right of confrontation where it appeared that his counsel made no effort to question the codefendant and that the judge instructed the jury that such refusals should not give rise to any unfavorable inferences against the movant. [47–48]

There was no error in a refusal to permit a defendant who testified in his own behalf at the trial of criminal cases to make an unsworn statement to the jury. [48–50]

TWO INDICTMENTS found and returned in the Superior Court on August 13, 1969.

The cases were tried before *Roy, J.*

*Charlotte A. Perretta* for the defendant O'Brien.

*John A. Pino* for the defendant DiMinico.

*Newman A. Flanagan,* Assistant District Attorney, for the Commonwealth.

CUTTER, J.   O'Brien and Christopher F. DiMinico were tried on indictments charging first degree murder and armed robbery at or near a market owned by Earl Crosby at 97 Heath Street in the Roxbury section of Boston.  A jury found each of them guilty of second degree murder and armed robbery in a trial conducted under G. L. c. 278, §§ 33A–33G.  At the close of the Commonwealth's evidence, a verdict of not guilty was directed for a codefendant, James G. McDowell, Jr.  The jury found another codefendant, James M. Laughran, not guilty.  O'Brien and DiMinico appealed.  Pertinent evidence is summarized below.

On the morning of August 5, 1969, McDowell entered the Pioneer Market and bought merchandise.  About two hours later, two men (identified as Laughran and DiMinico by two witnesses, Ben Crosby and Paulette Johnson) entered the market.  Ben Crosby and Paulette Johnson and some small children were in the store.  DiMinico, who admitted he had used narcotics that morning, told Ben Crosby (a nephew of Earl Crosby, the market's owner) to empty the cash registers and place the money in a bag.  The man identified as Laughran had a .25 caliber automatic pistol.  The two men left the store, after being there two to six minutes.  Finis Crosby (son of the owner), who was present but not seen, slipped out the back door and went to the front entrance with a shotgun.  He told the two robbers to "hold it."  In an exchange of shots, Finis Crosby was wounded in the chest.  He died an hour later.  DiMinico was hit with shotgun pellets in the exchange.  Ben Crosby testified that he did not see O'Brien in the vicinity of the store that morning.  Paulette Johnson did not see McDowell there nor did two witnesses see him get out of the escape automobile later near Mark and Day streets.

Witnesses outside the store saw two, three, or four men leave in a 1960 Oldsmobile convertible automobile. One witness, Benjamin Shepard, pulled up across the street from the market during the shooting. He followed the automobile to Mark and Day streets. At Mark Street, he observed four men alight from the car, two of them helping a third. Shepard called the police. Later, on the street nearby, Shepard saw a man whom he thought to be one of the four. He tackled and held this man, later identified as Laughran, until Officer Martin and an associate arrived.

By that time, the police had reason to search for the robbers in the only second floor apartment at 2 Mark Street. Police Sergeant King went to the door of that apartment, banged on it several times, "announced . . . [his] office," and began kicking the door. A voice said, "Wait a minute." McDowell appeared at the door. He stated to Sergeant King that no one was in the apartment. Subsequently DiMinico came to the door of the apartment followed by O'Brien. Sergeant King pulled them both into the hall. The apartment was dark. Sergeant King used O'Brien for a shield when he entered the apartment to make sure no one else was there.

An hour later, pursuant to a search warrant, Sergeant King and others made a search of the apartment and seized two firearms and other items. The firearms were turned over to Officer Walter Logue, who was attached to the Boston police ballistics office, along with a cartridge case found in the Oldsmobile parked on Day Street and a spent bullet found inside the Heath Street market. Officer Logue performed tests on the .25 automatic seized during the search. He testified that the bullet found in the Pioneer Market had been fired by that gun and the discharged Luger cartridge case found in the Oldsmobile had been used in the Luger pistol found in the Mark Street apartment. Officer Logue also determined that the small size shot taken from DiMinico was the same size as that used in Finis Crosby's gun.

O'BRIEN'S APPEAL.

1. O'Brien contends that two codefendants, McDowell and Laughran, should not have been permitted to testify during the Commonwealth's case in chief. At trial, the assistant district attorney represented to the judge that counsel for McDowell and Laughran had informed him that their clients wished to testify for the Commonwealth. Subject to O'Brien's exception, the judge ruled that these defendants could testify after a proper explanation to them of their right not to do so. The judge generally explained to the defendants as a group that they need not give evidence against themselves, but that, if they did take the stand, they waived the "protection of the normal right against self-incrimination." Later he made careful inquiries of McDowell and Laughran, individually, concerning (a) each witness's understanding of his rights and (b) his motives for testifying.

McDowell testified that on the morning of August 5, 1969, he was asleep in his apartment at 2 Mark Street when DiMinico,. O'Brien, and Joseph Forman (who had not been apprehended at the time of trial) came to his door. DiMinico was wounded. He helped DiMinico clean his wounds. DiMinico took a shower. Forman left through the back door. Then the police arrived.

McDowell also testified that, on several occasions prior to trial, O'Brien informed at least Laughran and McDowell that if "things look bad for me, you cop out or tell the store [story?]." He did not see Laughran on the morning of August 5 until he saw him at the police station.

Laughran testified that, on the morning of the homicide, he was standing on the corner of Day and Center streets when his attention was drawn to a commotion near Day and Mark streets. As he went to investigate, he was struck and grabbed from behind and later arrested. Laughran also testified that O'Brien, in his presence, told McDowell to say that O'Brien had slept at his house on August 4, 1969, and on subsequent occasions, including one at Bridge-

water State Hospital, O'Brien said to him in substance, "Don't worry. I'll cop out for you."

McDowell and Laughran were fully informed by the judge of their right not to testify (see G. L. c. 233, § 20, Third [1]), and they explicitly waived their right in open court and took the stand at their own specific request. Once these defendants took the stand they were open to cross-examination, at least about all matters relevant to the crime with which they were charged. See *Commonwealth* v. *West,* 357 Mass. 245, 248–249. See also *Commonwealth* v. *Fuller,* 260 Mass. 329, 333–334. O'Brien contends that he was prejudiced by the testimony of McDowell and Laughran which tended to exculpate themselves and to harm him. O'Brien's counsel had as full opportunity to cross-examine McDowell and Laughran as he did to cross-examine any other witness for the Commonwealth, or as he would have had to cross-examine them if they had taken the stand in their own behalf.

We perceive no valid distinction between McDowell's and Laughran's testimony, given on behalf of the Commonwealth at their request, and that testimony if it had been given on behalf of these defendants taking the stand in their own defence. O'Brien's brief in effect concedes that all of McDowell's and Laughran's testimony could have been given during their defence. The judge, in his charge, told the jury that no greater credibility was to attach to that testimony because they testified during the Commonwealth's case.

The language of G. L. c. 233, § 20, Third (fn. 1), removes the common law disqualification of a criminal defendant to testify, without in terms making any distinction based upon whether the defendant, who testifies at his own request, does so as a witness called by himself or as a witness placed on the stand by the Commonwealth. Nothing in *Common-*

---

[1] Section 20, Third, provides that "The defendant in the trial of an indictment, complaint or other criminal proceeding shall, at his own request, but not otherwise, be allowed to testify; but his neglect or refusal to testify shall not create any presumption against him."

*wealth* v. *Fuller*, 260 Mass. 329, 334, or in *Commonwealth* v. *Domanski*, 332 Mass. 66, 74–75, leads us to any other conclusion. See also *Commonwealth* v. *Mullen*, 150 Mass. 394, 397–398.

2. DiMinico testified in his own behalf, probably primarily to clear Laughran (whom he asserted to be innocent) of any complicity. DiMinico admitted that he himself was involved in the robbery. He refused to answer questions about other persons who might have been involved. He emphatically testified that Laughran was not with him.

Upon cross-examination by the Commonwealth, DiMinico specifically refused to answer at all any questions about whether O'Brien was with him during the robbery. The context of the questions indicates no desire on DiMinico's part to implicate O'Brien, but instead a firm purpose not to discuss O'Brien at all. After DiMinico's direct testimony, cross-examination, and redirect testimony, O'Brien's counsel moved for a mistrial on the ground that these refusals denied him the right to confrontation.[2] A mistrial was denied subject to O'Brien's exceptions. O'Brien's counsel made no effort whatsoever to ask questions of DiMinico and (in a bench conference) declined in behalf of O'Brien to "release" DiMinico from any obligation of silence. In his charge, the judge instructed the jury that DiMinico's refusal to testify (i.e. whether O'Brien was at the scene of the robbery) should not give rise to any unfavorable inference against O'Brien. O'Brien thus shows no denial of his constitutional right to confront DiMinico as a witness against him or that his counsel was prevented in any degree from cross-examining DiMinico.

The testimony strongly suggests that DiMinico was disturbed that Laughran was charged with the others as being involved in the crime. Although he was eager to exculpate

---

[2] While DiMinico was testifying, O'Brien's counsel did not ask the trial judge (a) to require DiMinico to testify concerning O'Brien or (b) then to instruct the jury that no adverse inference could be taken against O'Brien by DiMinico's refusal to testify about him. The judge in his charge properly described DiMinico's answers concerning O'Brien as "just a sheer negative" which "cannot be used against O'Brien." See *Commonwealth* v. *French*, 357 Mass. 356, 373.

Laughran, he was not willing to inculpate anyone other than himself. The evidence at least permitted the conclusion that Laughran (as well as McDowell) was not involved at all and that witnesses, who identified him as at the scene of the murder, were mistaken.

This was not (cf. *Douglas* v. *Alabama,* 380 U. S. 415, 418–420; *Fletcher* v. *United States,* 332 F. 2d 724, 725–727 [D.C. Cir.]) a case where the prosecution improperly sought to obtain damaging information from a recalcitrant witness (or to create the basis for unfavorable inferences from his claims of privilege). DiMinico simply refused to answer the prosecution's questions about O'Brien. Thereafter O'Brien, perhaps relieved that no harmful information about him had been given, did not exercise his right to cross-examine. See *Namet* v. *United States,* 373 U. S. 179, 186–187. The judge's caution in his charge was adequate. We perceive no error and no prejudicial harm to O'Brien.[3]

### DiMinico's Appeal.

3. The matters argued in DiMinico's brief all relate to the judge's refusal to permit him to make an unsworn statement to the jury. These contentions arise from the following circumstances.

After the arguments and prior to the charge, O'Brien, who did not testify, was asked by the judge if he wished to make an unsworn statement to the jury. O'Brien did make a very ineffective statement. The judge, however, did not ask Laughran and DiMinico if they wished to make such a statement. He had made it clear early in the trial that he was not going to allow any such statement by any defendant who took the stand as a witness. Concerning DiMinico the judge said, "I rule against it because he has had an opportunity to tell his story under oath and, in view of that, I don't believe that the custom would cover him."

---

[3] For a situation in some respects analogous, see *Nelson* v. *O'Neil,* 402 U. S. 622.

It has been customary in Massachusetts to permit a defendant (but only in a capital case), without regard to whether he exercises his privilege of testifying, to make an unsworn statement to the jury before the charge. Such a statement is not evidence and, if one is made, the jury should be told that the statement is not evidence. See *Commonwealth* v. *McConnell,* 162 Mass. 499, 501–503; *Commonwealth* v. *Dascalakis,* 246 Mass. 12, 32; *Commonwealth* v. *Stewart,* 255 Mass. 9, 14–19 ("No finding can be founded by the jury on . . . such a statement, but every finding essential to the verdict must rest upon evidence and testimony presented in the usual way and under customary safeguards as to competency and credibility"); *Commonwealth* v. *Madeiros,* 257 Mass. 1, 2–3. See also Smith, Criminal Practice and Procedure, § 1277.

The reason for such a practice has entirely disappeared with the removal of the common-law disqualification of a defendant in a criminal case to be a witness. See St. 1866, c. 260, now found in G. L. c. 233, § 20, Third (fn. 1). As was said in *Ferguson* v. *Georgia,* 365 U. S. 570, 585–586, the unsworn statement has been recognized "as simply a stopgap solution for the serious difficulties for the accused created" by his former incompetency to testify and "little value has been attached" to the privilege of making such a statement where an accused is capable of testifying. See Wigmore, Evidence (3d ed.) §§ 575–580, esp. § 579; Glanville Williams, Proof of Guilt (3d ed.) 45, 47, 70–72; note 68 L. Q. Rev. 463; notes 94 Ir. L. T. 43, 49, 55. In the *Ferguson* case, *supra* (365 U. S. 570, 586, fn. 17), it is said that Massachusetts alone still allows such an unsworn statement in some cases. For a brief summary of the somewhat comparable rule in other jurisdictions denying to the defendant any right to participate in argument or in statements, where the accused has counsel, see *People* v. *Richardson,* 4 N. Y. 2d 224, 226–229. See also *Eyer* v. *Brady,* 128 F. 2d 1012, 1014–1015 (4th Cir.); *Egan* v. *Teets,* 251 F. 2d 571, 578 (9th Cir.); *Brasier* v. *Jeary,* 256 F. 2d 474, 477–478 (8th Cir.); *United States* v. *Foster,*

9 F. R. D. 367, 371–372 (S. D. N. Y.); *People* v. *Marcus*, 133 Cal. App. 2d 579, 583.

We are of opinion that permitting an unsworn statement (now that any reason for it has disappeared) is not now required. Obviously, if a defendant has himself testified, the jury may become confused between his actual testimony, which is evidence subject to cross-examination, and his unsworn statement which is not evidence and is not subject to cross-examination. There was no error in refusing DiMinico permission to make a statement.

4. The evidence has been reviewed in accordance with our duty under G. L. c. 278, § 33E (as amended through St. 1962, c. 453). We see no reason in justice for us to take any action under that section. The trial appears to have been conducted with unusual skill and with scrupulous regard for every proper interest of each defendant.

*Judgments affirmed.*