COMMONWEALTH *vs.* HECTOR SANTIAGO RODRIQUEZ
(and a companion case).

Worcester.    May 7, 1973. — August 6, 1973.

Present:    TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, KAPLAN,
& WILKINS, JJ.

*Jury and Jurors. Practice, Criminal,* Challenge to the array of jurors, Ex-
amination of jurors, Unsworn statement by defendant, Charge to jury,
Deliberation of jury, Judicial discretion. *Constitutional Law,* Jury.
*Search and Seizure, Evidence,* Relevancy and materiality, Exhibit.

At the trial of two Puerto Ricans for the murder of a black, the bare objec-
tion after all the jurors had been selected and sworn that the jury had
been unconstitutionally selected because no veniremen were of Puerto
Rican origin or blacks came too late, and raised no constitutional ques-
tion. [91-92]

Upon appeal from the conviction of two Puerto Ricans for the murder of a
black, it was held that the defendants were not denied due process of law
in that questions to prospective jurors were not sufficiently pointed at
racial prejudice where it appeared that the judge  in his remarks to the
veniremen spoke of racial prejudice in particular, although later in in-
terrogating prospective jurors he hewed to the general statutory ques-
tions, that the circumstances of the case did not highlight racial preju-
dice, and that counsel did not ask for questions on that subject. [92-93]

Entry by a police officer, immediately after hearing shots which killed a
man in a car near a house, of a bathroom with the consent of an occu-
pant of the house who shared the bathroom with others, resulting in the
officer's seeing a revolver at the bottom of an airshaft, was lawful. [93]

At the joint trial of two defendants for murder of a man shot in a car near
a house, a .32 caliber revolver resembling a gun seen previously in the
hands of one defendant and found in a place in the house to which the
second defendant had access, a .38 caliber revolver and shells found
near the house, a spent bullet found imbedded in the car, and a lead
fragment recovered from the victim's body were properly admitted in
evidence [94]; the lead fragment, the spent bullet and the .38 caliber
revolver and shells were adequately traced from their point of origin to
the hand of the prosecutor [94-95].

At a trial for murder by shooting, there was no error in the admission in

evidence of certain photographs of the site of the crime taken only a few days before trial, or of the clothing worn by the victim, or of a picture of a defendant taken after his arrest. [95]

At a murder trial, where the judge told the jury when recessing court for a holiday near the close of the Commonwealth's case that the defendants still had their opportunity to be heard and that the jury should hear both sides, but on resuming trial the defendants rested without proof of their own, there was no abuse of discretion in the denial of their request to make unsworn statements to the jury. [95-96]

Upon appeal from the conviction of two defendants as principals of murder, there was no merit in a contention of one defendant that the judge's charge was "subtle," and possibly misunderstood, with respect to whether one defendant could be found guilty and the other defendant not guilty. [96-97]

In a murder case, where the jury retired to consider a verdict in the early afternoon, were recalled to the court room nearly nine hours later and told that to avoid an "exasperation" verdict they would suspend until the morning, when they would be charged on "the manner in which a deliberation may bring about a verdict," there was no error in the judge's reading, when court resumed in the morning, the charge set out in *Commonwealth* v. *Tuey,* 8 Cush. 1, 2-3, following which the jury withdrew and returned with their verdicts at noon. [97-98]

Statement of desirable emendations of the charge set forth in *Commonwealth* v. *Tuey,* 8 Cush. 1, 2-3. [98-101]

The *Tuey* Charge, with Changes — Appendix A. [101-102]

A B A Standard re jury deliberations, with Illustrative Charge, Appendix B. [102-103]

Two INDICTMENTS found and returned in the Superior Court on May 14, 1971.

The cases were tried before *Lappin,* J.

*John F. Buckley* for Hector Santiago Rodriquez.

*James L. Clifford* for Rogelio Felix Rodriquez, Jr.

*Stanley J. Jablonski,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.   The defendants Hector Santiago Rodriquez (Hector) and Rogelio Felix Rodriquez, Jr. (Felix), indicted for the murder in the first degree of William Alonzo Johnson, and jointly tried, were severally found guilty of that crime, but with recommendation that the penalty of death be not imposed. From the judgments of conviction, the defendants appeal under G. L. c. 278, §§ 33A-33G. Their argued assigned errors range from the composition of the jury, through the admission of various pieces of evidence, to the

giving of the charge set out in *Commonwealth* v. *Tuey*, 8 Cush. 1, 2-3, when it appeared that the jury were having trouble reaching a verdict. We find no error, nor, upon an appraisal of the whole record, do we find occasion to disturb the convictions or sentences under § 33E. We have, however, some comments to make about the future use of the *Tuey* charge.

The facts were in outline as follows. About 1 A.M., March 23, 1971, a Volkswagen car with Johnson driving and James Glass as passenger drew up at a curb on Wellington Street, Worcester, alongside a hedge between two houses, Nos. 44 and 46. The men had come from Providence that night. Glass observed Felix coming away from a car parked a short distance ahead. Felix entered No. 46. After a few minutes' conversation between Johnson and Glass, Glass left the car and entered No. 46. He met Felix in the front hallway and saw him stick a shiny revolver in his belt. Glass asked whether he could "cop", that is, buy narcotics. Felix said yes, but asked if that was Johnson's car outside and who was in the car. Glass said the car was Johnson's but the man in the car was "Terry." Hector emerged from a door on the right and joined Felix and Glass. Hector had a dark gun. Felix said that they had been held up last week, that Johnson was one of those who did it and they were going to get him. With Glass between them, Felix and Hector walked out of the house and toward Johnson's car. Glass, falling a little behind, tried to signal to Johnson, who had kept the motor running, to drive away, but Johnson may not have caught the signal; he did not drive off. As Felix and Hector approached the car, Johnson leaned over, rolled down the window, and said, "Felix, what's happening?" Felix, looking into the car, said "Yeah, this is the one," or words to that effect, and said something to Hector in Spanish. Hector stuck his gun through the open window, two clicks or misfires were heard, then two or three shots. Felix and Hector turned back into No. 46. As Felix passed by Glass, he said, "That'll teach the . . . from sticking us up."

During the shooting Glass was perhaps ten to twenty feet

from the car. He now ran to the car, saw Johnson bleeding. Johnson said, "Help me, Glass." The car rolled backward at an angle from the curb, coming to rest across the street against a parked car.

The shots had been heard by police officers in a car nearby and they were on the scene almost at once. Others soon arrived. After a word with Glass, the police stationed men at the front and back of No. 46. Detective O'Connor went into the building. In the front hallway he met the manager, Albert J. LaPrade. LaPrade had keys to apartment 1, on the right on that floor, and offered to let the police in. Instead Detective O'Connor knocked on the door. Felix opened up. He said he had been asleep and hadn't heard anything. Detective O'Connor asked Felix whether he could look around and Felix said, "Sure, you can look around any place you want." Looking down the bathroom window opening on an airshaft running from roof to cellar, Detective O'Connor saw a shiny revolver at the bottom of the shaft. This was recovered — a nickel-plated .32 caliber Harrington & Richardson revolver. Glass testified it resembled the weapon he had seen Felix put in his belt. Carlos Torres Lopez, who resided in the set of rooms with Felix and Hector, testified that he had seen Hector with a similar shiny gun some five months before the shooting, and LaPrade testified he had seen Hector brandishing such a gun the Sunday before the shooting.

Johnson had been taken to the hospital. One bullet had passed through the right side of his jaw and had lodged in his neck. Another had entered his right upper chest, emerged under his left armpit, and lodged in the door on the driver's side of the Volkswagen. Hemorrhage in the chest cavity was the probable cause of Johnson's death which occurred at 2 A.M. Questioned by a police officer, Johnson had said that Felix shot him (a natural mistake on Johnson's part, as it was Felix he had seen at the window of the car). He described Felix accurately and said his partner Glass, whom he also described, would be able to identify Felix.

Later that morning, at 4 A.M., Carl Harvey Mitchell, walking his dogs, found in the hedge between Nos. 44 and 46 a

dark .38 caliber special Smith & Wesson revolver, with a live round and two discharged rounds in the cylinder, and two discharged rounds nearby. According to a police firearms expert, the four cartridge cases found in the hedge were fired from that .38 caliber special revolver; so was the spent bullet recovered from the car; the condition of the lead fragment recovered at the autopsy from Johnson's neck was consistent with its being .38 caliber ammunition and with its having been fired from a weapon of that type.

Lopez testified that both Felix and Hector had complained to him of being held up by Johnson; Hector said he wanted to kill Johnson because he had been robbed too many times. Lopez said that he had himself seen Hector robbed by Johnson at knife point five days before the March 23 shooting, and that on March 22, as he and Hector were standing outside No. 46, Johnson came by in a car and shot at them. Lopez said that Johnson, with others, was involved in many holdups of narcotics dealers.[1]

1. *The jury.* (a) After all fourteen jurors had been selected and sworn and the jury thus empanelled, counsel for the defendants raised the objection that the jury was an unconstitutional body because there were no persons of Puerto Rican origin or blacks on the special venire or the portion of the general venire[2] from which the petit jury was chosen — the defendants being Puerto Rican and the victim black. The judge thought the challenge should have been made before any juror was sworn. We agree that the challenge came too late (cf. *Commonwealth* v. *Slaney,* 350 Mass. 400, 401-402; *Commonwealth* v. *Del Valle,* 353 Mass. 684, 685-686);[3] it could not be claimed that counsel did not know or could not have ascertained before the interrogation of veniremen began what was the system of drawing venires from the general public.

---

[1] This narrative is enough to indicate that, passing over the specific evidential points later discussed, the proof was such that defendants' motions for directed verdicts of not guilty were properly overruled.

[2] The general jury pool was called upon after the special venire was exhausted.

[3] See also *Hinckley* v. *Perrin,* 253 Mass. 527, 527; *Commonwealth* v. *Cero,* 264 Mass. 264, 267-268; *Commonwealth* v. *Welosky,* 276 Mass. 398, 400.

Further, the bare assertion that the particular jury pools contained no Puerto Ricans or blacks raises no constitutional question. "[A] defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn." *Swain* v. *Alabama,* 380 U. S. 202, 208. A defendant is constitutionally entitled to a jury selection process free of discrimination against his grouping in the community — a quite different thing. It is true that the fact of a drastic departure from proportionality over a period of time may provide evidence of discriminatory exclusion. *Carter* v. *Jury Commn. of Greene County,* 396 U. S. 320, 327-328. *Alexander* v. *Louisiana,* 405 U. S. 625, 627-628, 629-631.[4] But here not even such a charge was made. We need hardly add that any timely substantiated representation that the jury selection system is biased against any identifiable group would deserve the most careful attention.

(b) Although no objection was taken on the point at trial, the defendants now say that the judge did not go far enough in probing the jury about racial prejudice. In his remarks to the venires the judge dealt with bias and prejudice in terms that went beyond the statute, G. L. c. 234, § 28, for he spoke not merely of bias and prejudice in general, but of racial prejudice in particular. In the interrogation of prospective jurors, the judge hewed more or less to the general statutory formula, but the jurors may well have connected the questions to the judge's earlier and stronger remarks to the venires. The defendants argue, however, that the admonitions and questions to the jurors were not sufficiently pointed at racial prejudice in the given context to satisfy *Ham* v. *South Carolina,* 409 U. S. 524. We have interpreted the *Ham* case to require this intensive treatment by the judge of the question of prejudice only when the circumstances of the particular case highlight that question, and when, in addition, counsel, making the judgment that examining the

---

[4]See, generally, Comment, 20 U. C. L. A. Law Rev. 581. See also *Commonwealth* v. *Beneficial Fin. Co.* 360 Mass. 188, 211-216.

jurors on that line would be helpful, asks the judge to carry out such an interrogation. *Commonwealth* v. *Ross,* 363 Mass. 665, 671-672. *Commonwealth* v. *Ryles,* 363 Mass. 674, 675-676. Here there was no request by counsel, and so far as appears there were no tendentious circumstances in the case beyond the fact that the defendants were Puerto Rican.

2. *The police search.* The defendant Hector apparently protests, in effect, that Detective O'Connor's entry upon and inspection of the bathroom, eventuating in the discovery of the shiny .32 caliber revolver, was illegal. On voir dire, much was made of the layout of apartment 1[5] and the rental arrangements that the occupants — Felix, Hector, and Lopez — had made with LaPrade. The Commonwealth claimed that within apartment 1 each occupant had rented a separate room with common right to the hallway and bathroom; whereas the defendants claimed that what had been rented was the apartment as such, including hallway and bathroom. The judge found for the Commonwealth upon adequate proof. But on either view of the rental arrangements, it seems that Felix, having a right of access to the bathroom, although sharing the right with others, might consent to Detective O'Connor's entering and examining there.[6] See *Commonwealth* v. *Connolly,* 356 Mass. 617, 624; *Commonwealth* v. *Martin,* 358 Mass. 282, 286-290; *Frazier* v. *Cupp,* 394 U. S. 731, 740. It was not claimed that Felix's consent was other than voluntary as that term is defined in the search cases. See *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 223-227. The inspection could also be justified as one made in immediate pursuit of suspected felons. See *Warden* v. *Hayden,* 387 U. S. 294, 298-300 (facts similar to those at bar); *Commonwealth* v. *Stroud,* 361 Mass. 870.[7]

---

[5]In this connection a homemade sketch or diagram by LaPrade was admitted and used. There was objection to this but it was groundless.

[6]There was, indeed, some further testimony that Lopez and Hector had also said that Detective O'Connor might look around.

[7]LaPrade followed Detective O'Connor through the door of apartment 1. Hector objected to testimony by LaPrade as to his observations of Hector's room on the ground that his presence was "illegal," but the point seems untenable. See *Eisentrager* v. *Hocker,* 450 F. 2d 490, 492 (9th Cir.); *Sackler* v. *Sackler,* 15 N. Y. 2d 40, 43-44. And as LaPrade's observations can be taken to have been made during the

Commonwealth *v.* Rodriquez.

3. *The evidence.* (a) The defendant Felix questions the admission in evidence of the shiny gun; the defendant Hector attacks the admission in evidence of both guns, the spent bullet, and the lead fragment. The contention is that insufficient connection was shown between those exhibits and anything done by either defendant. This is really a claim that the exhibits were irrelevant. But no more was required to be shown than that each exhibit enhanced the probability of a proposition among the several propositions of varying probabilities which, considered rationally together, made a case against a defendant. Cf. *Crowe* v. *Ward,* 363 Mass. 85, 89, and authorities cited. That a shiny .32 caliber revolver — resembling the gun seen previously in Hector's hands[8] — was found at the bottom of an airshaft to which Felix had access, not only tended to confirm Glass's account of his meeting with Felix before the shooting, when he saw Felix in possession of a shiny gun, but also suggests that Felix had promptly taken action quite natural to one implicated in the shooting. As to the .38 caliber revolver and the bullet found imbedded in the car, these were the fatal instruments according to the testimony of the ballisticians and the doctor, and the connection of these exhibits with Hector lies in testimony that it was Hector who fired at Johnson.[9] The importance of the lead fragment is that it does not confound but is rather consistent with the rest of the expert testimony.

(b) The lead fragment, it is argued, should not have been

period of immediate pursuit, his testimony appears admissible even if his presence must be justified on the same basis as that of the police. The testimony was in all events quite insignificant.

[8] Both defendants objected to testimony by Lopez that when he saw Hector with a shiny gun five months before the shooting, Hector said Johnson had held him up and he wanted to shoot Johnson. Proof of the expression of such a murderous intention was admissible. Wigmore, Evidence (3d ed.) §§ 105-111, 1732. Lopez was asked whether he had seen Hector with a gun five days before the shooting. Hector objected that the question was leading, and also objected to the use of a statement, supposedly given by Lopez to the police, as a means of refreshing Lopez's recollection. Lopez did not give an affirmative answer, so Hector cannot claim injury, but the judge thought a leading question justified because of Lopez's difficulty with the English language, and we cannot disagree (see *Commonwealth* v. *Lewis,* 346 Mass. 373, 380); and interrogation regarding the refresher statement was evidently abandoned.

[9] To which may be added Glass's testimony that Hector carried and used a dark gun.

received because its entire passage from the hand of Dr. Bigelow, who performed the autopsy, to the hand of the prosecutor who offered it in evidence, was not traced. But, apart from the identification of the fragment by Dr. Bigelow's testimony, it was proved that he turned over the fragment to Detective O'Connor, present at the autopsy; that was surely enough to qualify it for admission, subject to discrediting evidence, which was not offered. See *Commonwealth* v. *Bentley,* 97 Mass. 551, 554. Similarly it was shown that the spent bullet was extracted from the Volkswagen car by Officer Doyle and was passed to and examined for traces of blood by the State chemist Bianco. The admission of the .38 caliber revolver and shells is questioned because according to Mitchell there was a lapse of some days before he turned these exhibits over to the police. He testified that, not wanting to get involved, he sold the revolver; then he had second thoughts, went to a lawyer (who was representing Lopez), and was advised to try to recover the revolver, which he did by buying it back from the purchaser; thus the revolver reached the police. He was certain that this was the revolver he had found in the hedge because he had kept a note of the serial number. This story, which remained unshaken, was not so implausible as to warrant its rejection.

(c) A scattering of objections by Hector are quickly answered. Certain photographs of the site of the crime were admitted although taken only a few days before the trial, but it is enough to say that their relation to earlier conditions was explained satisfactorily. See *Charles L. Hazelton & Son, Inc.* v. *Teel,* 349 Mass. 617, 622. All the clothing worn by the victim was introduced (including his jacket with a hole that could have been made by a bullet): these exhibits perhaps went to the point that the victim was not armed; otherwise they were innocuous. A picture of Hector after arrest was perhaps unnecessary, but not offensively incitive.

4. *Refusal of unsworn statement.* The Commonwealth had nearly completed its case when the court recessed for the Thanksgiving holiday. Sending the jury home, the judge said they should bear in mind that the defendants still had their

opportunity and that it was well to hear both sides of a case before one made up one's mind. The defendants did not object to these routine remarks. On resumption of the trial on the Friday, however, the defendants rested on the Commonwealth's case and offered no proof of their own. They asked permission to make unsworn statements to the jury, but the judge refused permission, to which they took exception.

As explained in *Commonwealth* v. *O'Brien,* 360 Mass. 42, 48-50, and *Ferguson* v. *Georgia,* 365 U. S. 570, 585-586, the practice of allowing the defendant to make an unsworn statement came in to compensate in some degree for his incompetence to testify in his own behalf. With the abolition of this rule of incompetency, there is no place for the unsworn statement except in the discretion of the trial judge; and although a case where the defendant has not testified may be a more suitable one for allowing the statement than a case where he has, we think the matter still lies in discretion. The defendants say that it was peculiarly necessary for the judge to allow them to make statements so that they might to some extent redeem in the minds of the jury the judge's prior promise or forecast that they would present their side of the case; in the denial of permission the defendants profess to see a deprivation of the jury right and of the privilege against self-incrimination. The argument seems hyperbolic both as to the effect of the incident and as to the Constitution. The judge duly charged the jury on burden of proof and the defendants' privilege.

5. *Instructions.* (a) Under our statute, G. L. c. 274, § 2, regarding the responsibility of accomplices, Felix as well as Hector was indicted as a principal. The judge instructed the jury at length as to the acts of one that could be imputed to the other and concluded that on differing views of the evidence the jury might find both defendants guilty, or both not guilty, or one guilty and the other not. The defendant Felix attempts in his brief to support his exception to the charge not on the ground that it was erroneous in substance, but that it was "subtle," and that the jury might have misunderstood it, as shown by the fact that they later put to the

judge the question whether one defendant could be found guilty and the other not. (The judge answered the specific question.) Whether further elaboration of the charge was necessary or desirable in the circumstances of the case seems a matter within the discretion of the trial judge. See *Commonwealth* v. *Otero,* 356 Mass. 724.

(b) The jury retired to consider a verdict at 1:42 P.M., returned to the court room at 8:28 P.M. for a few moments to hear the answer to the question which they had put to the judge, and continued deliberations into the evening. At 10:27 P.M. the jury were recalled to the court room. The judge said that it was evident from the lapse of time that the jury were having difficulty; that this was not unusual and was rather a sign of deliberation; but that, to avoid a verdict reached as a result of "exasperation," the jury would suspend until the morning, when they would be charged on "the manner in which a deliberation may bring about a verdict . . . I know sometimes people are apt to say, 'Well, we will declare a mistrial.' Well, I, for one, do not approve of this type of thing." Actually, said the judge, considering mealtimes, the jury had had only about seven hours of effective deliberation, which was very little time.

Resuming in the court room next morning, the judge read the well-known charge of Hoar, J., set out in *Commonwealth* v. *Tuey,* 8 Cush. 1, 2-3 (1851).[10] The jury withdrew at 10:26 A. M. and returned with their verdicts at noon.

The defendants excepted to the terms of the charge, and also to its timing or setting — it was given prematurely, they say, and it was the more coercive because the members of the jury were restive: they had been sequestered and sent to a hotel the previous night though they were under the belief that they would be allowed to separate and sleep at home.[11]

[10]He also read from the opinion of this court by Bigelow, J., approving the charge.

[11]The jury had been told that they would go home nightly but it is not clear they would assume they could do so after commencing deliberations. The practice in the Commonwealth is not to allow a separation of the jurors in a criminal case during their deliberations. See *Commonwealth* v. *Della Porta,* 324 Mass. 193. This practice seems to have been reflected in the oath given by the clerk to the court officers who were to guard the jurors when they retired after receiving the judge's charge.

Commonwealth *v.* Rodriquez.

The exception fails because our decided cases have held the *Tuey* language to be nonprejudicial, and we do not find enough in the circumstances of its use here to render it coercive to the point of calling for reversal of the judgments. Here we follow *Commonwealth* v. *Rollins,* 354 Mass. 630, 636-639.

For the future, however, we think certain emendations of the *Tuey* charge are desirable in the interests of the better administration of criminal justice.

The *Tuey* charge as it appears in 8 Cushing is intended to be used when because of the lapse of time or otherwise the judge apprehends that the jury is deadlocked. It says in essence: The verdict to which each juror agrees must be his own. But as the case must be decided sometime, and as there is no reason to suppose that another jury would be a better one, or that substantially different evidence would be presented to them, it is the duty of the present jury to decide the case if they can conscientiously do so. To this end jurors should attend respectfully to each other's arguments. And if much the larger number of the jury are for conviction, a dissenting juror should consider whether a doubt in his own mind is a reasonable one when it makes no impression on the minds of so many others. On the other hand, if a majority are for acquittal, the minority ought similarly to question the correctness of their own judgment. (The charge refers interstitially to the burden of proof.)

Since the American Bar Association's Advisory Committee on the Criminal Trial, in its report, *Standards Relating to Trial by Jury,* recommended in 1968 against the use of the *Tuey* charge[12] — or its Federal counterpart, the *Allen* charge[13] — in the form summarized above, professional and judicial thought and writing on the subject have been intensified. There is now solid support for two propositions.

First, it is not true, as the *Tuey* charge states, that "the

[12]Standard 5.4 with Commentary at pp. 145-158 of the report (part of the Project on Minimum Standards for Criminal Justice). The recommendation was approved by the House of Delegates. See Appendix B, *infra.*

[13]*Allen* v. *United States,* 164 U. S. 492, 501 (1896). The *Allen* charge was taken from the *Tuey* charge.

Commonwealth *v.* Rodriquez.

case must at some time be decided," if the statement is taken, as ordinarily it would be, to mean that a jury must some time convict or acquit. It is not even true that in the event of a mistrial, another trial will inevitably take place and another jury will be empanelled. The misstatement should be corrected even if it is a slight one, but it seems material because it has a tendency toward coercion. See *United States* v. *Flannery,* 451 F. 2d 880, 883 (1st Cir.); *United States* v. *Fioravanti,* 412 F. 2d 407, 416 (3d Cir.), cert. den. sub nom. *Panaccione* v. *United States,* 396 U. S. 837.

Second, the *Tuey* charge invites the members of the tentative minority to reconsider their position in the light of the views of the tentative majority, but does not invite the majority members to reciprocate toward the minority (except as it asks each juror to listen to the others). The imbalance and weakness of this part of the *Tuey* charge have now been widely recognized. Judge McGowan has remarked that it "has widely been thought to contain the true dangers to free and unfettered exercise of individual judgment and expression of conscience which is at the very core of the jury system. Many trial judges, although still using the *Allen* charge, have abandoned this element of it long ago." *United States* v. *Johnson,* 432 F. 2d 626, 633 (D. C. Cir.). It has been said to "assume an inherently faulty major premise," namely, "the majority is right and has reached its preliminary inclination by appropriately inspired processes, and that the minority in a given group possesses attributes of spurious rationality"; it is "a direction that . . . [jurors] be influenced by some sort of Gallup Poll conducted in the deliberation room"; it "serves to substitute the coercive influence of any early polling of the jury for the give and take of group deliberation,[14] a basic attribute of the jury system

---

[14]The possible effect of the majority-minority phase of the charge on the individual juror has been thus depicted: "The majority think he is guilty; the Court thinks I ought to agree with the majority so the Court must think he is guilty. While the Court did tell me not to surrender my conscientious convictions, he told me to doubt *seriously* the correctness of my own judgment. The Court was talking directly to me, since I am the one who is keeping everyone from going home. So I will just have to change my vote." *State* v. *Voeckell,* 69 Ariz. 145, 157 (dissenting opinion).

Commonwealth *v.* Rodriquez.

often expressed as a major characteristic justifying its continuance in our judicial system.'' Aldisert, J., in *United States* v. *Fioravanti, supra,* at 416, 417. Other expressions of disapproval of the majority-minority remarks in the *Tuey* charge are cited in the margin.[15] See also, Report, *supra,* at 152.

As Appendix A, we reproduce the *Tuey* charge with emendations to deal mainly with the two points considered above.

The *Tuey* charge in its original form has been called a ''dynamite,'' ''nitroglycerin,'' ''third degree,'' or ''shotgun'' charge. It went ''nearly if not quite to the extreme limit.'' *Highland Foundry Co.* v. *New York, N. H. & H. R.R.* 199 Mass. 403, 407. Consequently this court, like others, has been troubled with a number of cases questioning whether in particular circumstances the charge has not exceeded the limit and resulted in undue coercion. See, e.g., *Commonwealth* v. *Connearney,* 359 Mass. 200, 202, 205; *Commonwealth* v. *Moore,* 359 Mass. 509, 516; *Commonwealth* v. *Brunelle,* 361 Mass. 6, 12; *Commonwealth* v. *Richardson,* 361 Mass. 661, 663-664.[16] With the emendations indicated, the charge may be expected to present such questions less often. Still the charge has a sting and our approval of it is not to be taken as an indication that it may be used prematurely or without evident cause.

Also approved is the illustrative charge set out in the ABA study, to be used in conformance with the ABA standard.

Arizona later abandoned the *Tuey* charge in its conventional form. *State* v. *Thomas,* 86 Ariz. 161.

[15]See *Mangan* v. *Broderick & Bascom Rope Co.* 351 F. 2d 24, 30 (7th Cir.), cert. den. sub nom. *Broderick & Bascom Rope Co.* v. *Mangan,* 383 U. S. 926; *United States* v. *Thomas,* 449 F. 2d 1177, 1185 (D. C. Cir.); *United States* v. *Flannery,* 451 F. 2d 880, 883 (1st Cir.); *United States* v. *Bailey,* 468 F. 2d 652, 666 (5th Cir.); *Mt. Hamill State Sav. Bank* v. *Hughes,* 196 Iowa 861, 864; *Eikmeier* v. *Bennet,* 143 Kans. 888, 896; *State* v. *Randall,* 137 Mont. 534, 542; *Acunto* v. *Equitable Life Assur. Soc.* 270 App. Div. (N.Y.) 386,388; *Lennox* v. *White,* 133 W. Va. 1, 6-7; *Mead* v. *Richland Center,* 237 Wis. 537, 540-541.

The movement away from the conventional *Tuey-Allen* charge in Federal and State courts is summarized in *United States* v. *Bailey, supra,* at 665-669.

[16]Indeed, the judge's statement in the present case that he did not approve of mistrials might be thought to increase the coercive effect of the *Tuey* charge later given. Cf. *United States* v. *Thomas,* 449 F. 2d 1177, 1183 (D. C. Cir.).

Commonwealth *v.* Rodriquez.

See Appendix B. This charge is less emphatic than the amended *Tuey* charge and is intended for use either as part of the original instructions to the jury or as a supplemental instruction when the jurors appear to be running into difficulty reaching a verdict.

*Judgments affirmed.*

Appendix A

The Tuey Charge, with Changes

(Deletions are shown by brackets; additions by italics.)

The [only] *principal* mode, provided by our constitution and laws for deciding questions of fact in criminal cases, is by the verdict of a jury. In a large proportion of cases, and perhaps, strictly speaking, in all cases, absolute certainty cannot be attained or expected. Although the verdict to which a juror agrees must of course be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusion of his fellows, yet, in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor, and with a proper regard and deference to the opinions of each other. You should consider that *it is desirable that* the case [must at some time] be decided; that you are selected in the same manner, and from the same source, from which any future jury must be; and there is no reason to suppose that the case will ever be submitted to twelve [men] *persons* more intelligent, more impartial, or more competent to decide it, *or* that more or clearer evidence will be produced on the one side or the other. And with this view, it is your duty to decide the case, if you can conscientiously do so. In order to make a decision more practicable, the law imposes the burden of proof on one party or the other, in all cases. In the present case, the burden of proof is upon the commonwealth to establish every part of it, beyond a reasonable doubt; and if, in any part of it, you are left in doubt, the defendant is entitled to the benefit of the doubt, and must be acquitted. But, in conferring together, you ought to pay proper respect to each other's opinions, and listen, with a disposition to be convinced, to each other's arguments. [And, on the one hand, if much the larger number of your panel are for a conviction, a dissenting juror]. *Thus, where there is disagreement, jurors for acquittal* should consider whether a doubt in [his] *their* own [mind] *minds* is a reasonable one, which makes no impression upon the minds of [so many men,] *others,* equally honest, equally intelligent with [himself,] *themselves,* and who have heard the same evidence, with the same attention, with an equal desire to arrive at the truth, and under the sanction of the same oath. And, on the other hand, [if a majority are for acquittal, the

minority] *jurors for conviction* ought seriously to ask themselves, whether they may not reasonably [,and ought not to] doubt the correctness of a judgment, which is not concurred in by [most of those] *others* with whom they are associated; and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows.

## Appendix B

### ABA Standard

5.4 Length of deliberations; deadlocked jury.

(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

    (i) that in order to return a verdict, each juror must agree thereto;

    (ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

    (iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

    (iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

    (v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement.

### Illustrative Charge

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But

do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges — judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.