NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-1219                                      Appeals Court


COMMONWEALTH  vs.  AYYUB N. ABDUL-ALIM.


No. 15-P-1219.

Hampden.     December 13, 2016. - March 9, 2017.

Present:  Milkey, Massing, & Sacks, JJ.


Firearms.  Search and Seizure, Probable cause, Protective frisk.
    Constitutional Law, Search and seizure, Probable cause.
    Probable Cause.  Evidence, Exculpatory.  Jury and Jurors.
    Practice, Criminal, Motion to suppress, Continuance, Jury
    and jurors, Deliberation of jury, Record.


    Indictments found and returned in the Superior Court
Department on January 19, 2012.

    A pretrial motion to suppress evidence was heard by John S.
Ferrara, J., and the cases were tried before Constance M.
Sweeney, J.


    James B. Krasnoo for the defendant.
    Alyson Yorlano, Assistant District Attorney, for the
Commonwealth.


    MASSING, J.  The defendant, Ayyub Adbul-Alim, appeals from

his convictions of unlawful possession of a firearm and unlawful

possession of ammunition, aggravated by previous convictions of

a serious drug offense and a firearms violation.  See G. L.

c. 269, §§ 10(a), 10(d), 10(h), 10G(a). He claims, as he did at trial, that his prosecution was the result of a joint Federal and State effort designed to coerce him to provide information about the activities of potential Islamic terrorists in the Springfield area. In light of this claim, he argues specifically that (1) his motion to suppress the firearm and ammunition should have been allowed, (2) the trial judge wrongly denied his request for a continuance of the trial, (3) a mistrial ought to have been declared after the jury reported a deadlock, and (4) the trial judge thwarted appellate counsel's efforts to obtain record documents. We affirm.

1. _Motion to suppress_. a. _Background_. The motion judge found the following facts -- which the record supports and the defendant does not challenge as clearly erroneous -- regarding the search of the defendant's person.

The defendant had been married to Siham Nafi Stewart for about two years. They lived with their young child in a second-floor apartment on State Street in Springfield. During the investigation of a murder in the apartment building, Stewart and the defendant were identified as witnesses; Stewart met with a Springfield police lieutenant. Days later, after hearing gunfire in the apartment building, she called 911 and spoke with the Springfield police officers who responded to her apartment.

"[C]oncerned for the well-being of her child and herself if they continued to live with the defendant in that apartment," Stewart went to the Springfield police department "to disclose that her husband, the defendant, was involved in drug dealing and possessed a firearm." After speaking with a Springfield police sergeant, she was introduced to another Springfield officer, Ronald Sheehan, a twenty-five year veteran who was also a member of the Federal Bureau of Investigation (FBI) joint counterterrorism task force (task force), a joint effort of Federal, State, and local law enforcement personnel. Stewart told Sheehan that the defendant's supplier was a white male with tattoos on his hand who drove a white Jeep Cherokee. She showed Sheehan a photograph of the defendant's handgun. Sheehan learned that the defendant had prior convictions for drug trafficking and unlawful possession of a firearm, disqualifying him from lawfully possessing a gun in Massachusetts. Stewart and Sheehan had a number of in-person and telephone contacts over the next two to three weeks leading up to the defendant's arrest.

One evening in December, 2011, Stewart called Sheehan to tell him that the defendant was about to meet his supplier at the gasoline station next door to the apartment building. Sheehan and two other Springfield officers, partners William Berrios and Anthony Sowers, went to the location. Berrios and

Sowers saw a white Jeep Cherokee in the gasoline station parking lot and parked their marked cruiser behind it.[1]

Sheehan then received a second call from Stewart. She told him that the defendant had just left the apartment, was wearing a red vest, and had his gun with him. Sheehan observed the defendant leave the building, wearing a red vest or jacket, and walk toward the gasoline station. He warned Berrios and Sowers that the defendant was approaching and was armed. Berrios and Sowers seized the defendant, each grabbing an arm, and Sowers conducted a patfrisk. Finding nothing, he handcuffed the defendant and placed him in the back of the cruiser.

Stewart, who observed the patfrisk from the window of her apartment and did not see the officers remove the gun, called Sheehan again and informed him that the defendant had placed the gun in his underwear. Berrios and Sowers removed the defendant from the cruiser, and Berrios conducted a more thorough patfrisk. He felt a handgun in the defendant's groin area. The officers returned the defendant to the cruiser, unzipped his pants, and removed the gun.

b. Discussion. The defendant challenges his seizure and search on two grounds. First, he contends that Stewart's tip was unreliable. We disagree. This case does not involve an

___

[1] The judge made no further findings regarding the white Cherokee or its driver.

unidentified informant -- Stewart was known to the police as the defendant's wife. She had met with Sheehan many times and provided details about the defendant's drug activity and his supplier; she had even shown Sheehan a picture of the defendant's handgun. "In these circumstances, [Stewart's] basis of knowledge was established, and [her] report of [the defendant leaving the apartment with] a firearm 'could be regarded as reliable without any prior demonstration of [her] reliability.'" Commonwealth v. Edwards, 476 Mass. 341, 346 (2017), quoting from Commonwealth v. Gouse, 461 Mass. 787, 793 (2012). See Commonwealth v. Atchue, 393 Mass. 343, 347 (1984), quoting from United States v. Wilson, 479 F.2d 936, 940 (7th Cir. 1973) (information provided by known citizens "carries with it indicia of reliability"); Commonwealth v. Bakoian, 412 Mass. 295, 301 (1992) (informant revealed identity at time of tip, was known by police, and gave precise information); Commonwealth v. Peterson, 61 Mass. App. Ct. 632, 635 (2004) (statements voluntarily made to police by those with intimate knowledge of defendant).[2]

---

[2] The defendant argues that the motion judge "significantly" omitted from his findings of fact Sheehan's testimony that he "wanted to obtain the information of the driver of the white Cherokee after I observed any particular transactions that might have occurred to validate some of the information that was being provided by Ms. Stewart." We do not agree that this testimony calls Stewart's reliability into question. Sheehan was concerned with validating the information Stewart had supplied about the defendant's supplier, which was less detailed and

Second, the defendant contends that his detention was no longer justified after the initial patfrisk did not reveal a gun. See Commonwealth v. Douglas, 472 Mass. 439, 445 (2015) ("any reasonable suspicion that either [of defendant's passengers] had a weapon on his person was dissipated after the patfrisks revealed no weapons"); Commonwealth v. Amado, 474 Mass. 147, 153 (2016) (where patfrisk, justified by officer safety concerns, revealed no weapon, "the safety exigency justifying a search of the defendant's person ended, as there was no remaining suspicion that the defendant possessed a weapon").

We need not address the motion judge's conclusion that the continued detention of the defendant was proportional to the level of suspicion the officers possessed, because we agree with the judge's alternate rationale: that the police had probable cause to arrest the defendant. See Commonwealth v. Santaliz, 413 Mass. 238, 240 (1992) (arrest and attendant search without warrant must be based on probable cause); Commonwealth v. Claiborne, 423 Mass. 275, 279 (1996) (police officers may arrest without a warrant or probable cause that suspect has committed a felony). "Probable cause to arrest exists where the facts and circumstances in the arresting officer's knowledge and of which

reliable than the information she provided about her own husband.

he or she has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in believing that an offense has been or is being committed." Commonwealth v. Williams, 422 Mass. 111, 119 n.11 (1996).

Here, based on reliable, reasonably trustworthy information obtained from the defendant's wife, further investigation of the defendant's criminal record, and police corroboration of the information Stewart provided contemporaneously as the events unfolded, the officers had probable cause to arrest the defendant for illegal possession of a firearm -- even before Stewart's third phone call, telling them exactly where the gun was hidden. Having an adequate basis on which to arrest, the police had a right to conduct a search, not just a patfrisk. See Commonwealth v. Ilges, 64 Mass. App. Ct. 503, 515-516 (2005). To the extent the search of the defendant could be characterized as a strip search, it was justified by probable cause. See Amado, supra at 154 (probable cause required for strip search).

2. Withholding of exculpatory evidence; denial of motion for continuance. The defense at trial was that the Springfield police framed the defendant on firearm charges to create some leverage so that he would agree to become an informant for the FBI task force regarding activities at the Islamic mosque and community center that the defendant frequented. The defendant

testified that the police planted a gun on him, that he was approached by an FBI agent after the arrest, and that he had previously been approached by the same agent at his mosque. To support this defense, the defendant called Sheehan as a witness. Sheehan testified that after arresting the defendant, he contacted an FBI special agent, his supervisor at the task force, who came to the police station to speak with the defendant. Sheehan and the FBI agent asked the defendant to become an informant, but he was not interested. Sheehan further testified that the task force made total payments of $11,495 to Stewart over several months, beginning five months after the defendant's arrest. However, Sheehan denied that the payments were for information regarding the defendant.[3]

The defendant asserts that the Commonwealth failed to produce in discovery exculpatory materials in the possession of the FBI or, in the alternative, that the trial judge should have allowed his motion for a continuance to allow him to continue his pursuit of FBI records through a Freedom of Information Act (FOIA) request. Indeed, if the prosecution of the defendant was the result of a joint State and Federal effort, he would be entitled to exculpatory evidence in the possession of both State and Federal law enforcement personnel involved in the

---

[3] During cross-examination by the defendant, Stewart admitted receiving payment from the task force at some point after the defendant's arrest.

investigation.  See Commonwealth v. Daye, 411 Mass. 719, 734 (1992); Commonwealth v. Lykus, 451 Mass. 310, 326-328 (2008); Kyles v. Whitley, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police").  See also Mass.R.Crim.P. 14(a)(1)(A), as amended, 442 Mass. 1518 (2004) (prosecutor's discovery obligation extends to relevant items and information "in the possession, custody or control of the prosecutor, persons under the prosecutor's direction and control, or persons who have participated in investigating or evaluating the case and either regularly report to the prosecutor's office or have done so in the case").

Thus, if Sheehan's discussions with Stewart about the defendant or the firearms charges were the result of a joint State and Federal investigation, the Commonwealth would be obligated to produce discovery material in the possession of any State or Federal officers involved in the investigation. Likewise, if the Springfield police planted a gun on the defendant as part of a joint counterterrorism effort to coerce the defendant to become an informant, the Commonwealth would have an obligation to disclose that.  However, the Commonwealth denies that the defendant's arrest was the result of any joint effort, and our examination of the record provides us with no

basis to question this assertion or the motion judge's conclusion that no joint investigation occurred.[4]  To the extent the defendant seeks or possesses new information, not included in the record, to challenge this conclusion, his remedy is to file a postconviction motion in the Superior Court, where such facts can be developed and considered.  See Commonwealth v. Caillot, 449 Mass. 712, 724 n.8 (2007); Commonwealth v. Camacho, 472 Mass. 587, 598 (2015); Commonwealth v. McCormick, 48 Mass. App. Ct. 106, 107 (1999).

Similarly, we do not discern an abuse of discretion in the trial judge's decision not to permit a further continuance of the trial to await the result of the defendant's FOIA request.[5] The Commonwealth produced all the information it was required to produce, including records of payments to Stewart, and the defendant was able to vigorously pursue his defense.  Again, to

---

[4] Notwithstanding the absence of evidence of a joint investigation, the motion judge not only permitted the defendant to obtain discovery from Sheehan about his dealings with the defendant, but also ordered the Commonwealth to produce the following materials relevant to the defendant's claims:  "(1) [a]ny notes of Officer Sheehan re:  his interview of defendant on date of arrest; (2) any notes of other officers who sat in on interview; (3) and reports, notes or documents of Officer Sheehan's communications with other members of Joint Task Force within 24 hours (before & after) of defendant's arrest; (4) to the extent that those records are 'Joint Task Force' records, any requisite request for cooperation is hereby made to [F]ederal authorities."

[5] The trial had already been continued for two months, in part to accommodate the defendant's FOIA request.

the extent the defendant now possesses documentation from the FBI demonstrating that his defense was materially prejudiced, he must first make this claim in the trial court.[6]

3. Jury deadlock. The defendant claims that the judge erred by sending the jury back to deliberate without their consent after two communications of deadlock. See G. L. c. 234, § 34. He further contends that the judge's giving the Tuey-Rodriquez instruction[7] with knowledge of how the deliberations were trending -- the jury reported moving from a six-six split to a nine-three vote in favor of conviction -- was unduly coercive. Because the defendant did not raise these claims at trial, we review to determine whether any error created a substantial risk of a miscarriage of justice. See Commonwealth v. Figueroa, 468 Mass. 204, 223 (2014). We discern no error.

"If, after due and thorough deliberation, the jury twice advise the judge that they are unable to reach a verdict, the judge may not properly send the jury out again without their consent, unless the jury ask for some further explanation of the law." Commonwealth v. Jenkins, 416 Mass. 736, 737 (1994),

---

[6] We deny the defendant's motion to expand the record to include documents obtained from his FOIA request on the ground that such materials were not part of the trial court record, see Mass.R.A.P. 8, as amended, 430 Mass. 1601 (1999), and that he must first present such materials in the trial court.

[7] See Commonwealth v. Tuey, 9 Cush. 1, 2-3 (1851); Commonwealth v. Rodriquez, 364 Mass. 87, 101-102 (1973).

citing G. L. c. 234, § 34. "The decision as to when the jury's deliberations have been 'due and thorough' lies within the discretion of the judge." Commonwealth v. Carnes, 457 Mass. 812, 826 (2010). See Commonwealth v. Keane, 41 Mass. App. Ct. 656, 659 (1996) (because judge did not determine that jury had deliberated in a due and thorough fashion until second report of deadlock, judge did not err in sending jury out to deliberate further without their consent). This determination "requires evaluation of the 'complexity of the case, the extent of evidentiary conflict on material issues, and the total length of time the jury [have] spent attempting to resolve those conflicts.'" Carnes, supra, quoting from Commonwealth v. Winbush, 14 Mass. App. Ct. 680, 682 (1982).

The jury began deliberations in the early afternoon of the third day of trial. After two hours and ten minutes, the forewoman sent the judge a note reporting, "We are a hung jury at this time. [Six] Guilty [Six] Not Guilty. Please advise." Considering the brief duration of the deliberations in light of the length of the trial, the judge concluded, "I certainly am not finding that they are a hung jury at this time."[8] The judge

---

[8] The judge explained to counsel, "It's my inclination at this time -- it's twenty of four. I certainly am not going to find that the jury is hung. The case was impaneled on Thursday, it did not finish evidence until today. The jury has only been out for two hours. At the time this note was received, about two hours and ten minutes. . . . And, obviously, a two-hour

sent the jurors home for the day, informing them that they would continue deliberating the next day with "a brief but hopefully helpful instruction." She informed counsel that she would give the "ABA ALI charge"[9] the next day, and "[i]f they reported deadlocked thereafter," and if she determined "there was an actual deadlock report thereafter," she would then give the Tuey-Rodriquez charge. Counsel did not object.

The next morning the judge gave the promised ABA charge and the jurors continued to deliberate. At noon, the forewoman sent another note: "We are stuck at [three] not guilty and [nine] guilty. Please advise." The judge then gave the Tuey-Rodriquez instruction, again without objection. The jury returned unanimous guilty verdicts about two and one-half hours later. After the verdict was recorded and the jurors excused, the defendant asked the judge to poll the jury based on their

_____

deliberation following a two-and-[one]-half-day trial is a small amount of time for a jury to declare that they are hung. So I certainly am not finding that they are a hung jury at this time."

[9] The ABA charge, see Rodriquez, 364 Mass. at 102 (Appendix B), "is less emphatic than the amended Tuey charge and is intended for use either as part of the original instructions to the jury or as a supplemental instruction when the jurors appear to be running into difficulty reaching a verdict," Rodriquez, 364 Mass. at 101.

reported six-six and nine-three deadlocks.  The judge denied the request.[10]

The judge did not abuse her discretion in determining, without objection, that deliberations had not been due and thorough when the forewoman sent the first note.  After what amounted to two full days of trial (not including jury selection) with eleven witnesses, the judge could reasonably conclude that two hours and ten minutes of deliberations was not due and thorough within the meaning of G. L. c. 234, § 34.  Although the judge did not use the words "due and thorough," her refusal to find "that they are a hung jury at this time" clearly implied such a finding.  "[T]he judge could properly have concluded, as [she] did in different words, that the brief time spent in deliberations did not amount to 'due and thorough' consideration of the case."  Winbush, supra at 682.  Cf. Jenkins, 416 Mass. at 738 (giving Tuey-Rodriquez charge "implied that the judge had concluded that the jury's deliberations were 'due and thorough,' in the words of § 34").

The defendant further argues that the Tuey-Rodriguez charge was unduly coercive in the circumstances of this case because "[a]ny effort by the court to persuade the jury to reach an agreement after reporting its numerical split . . . may be

---

[10] The judge did not abuse her discretion by denying the defendant's request.  See Commonwealth v. Hardy, 431 Mass. 387, 399 (2000).

interpreted by the minority as an implied command to agree with the majority." Smith v. United States, 542 A.2d 823, 824 (D.C. Cir. 1988). We disagree. The amendments to the Tuey charge made in Rodriquez were designed specifically to address the imbalance created when the judge "invites the members of the tentative minority to reconsider their position in the light of the views of the tentative majority, but does not invite the majority members to reciprocate toward the minority." Commonwealth v. Rodriquez, 364 Mass. 87, 99 (1973).[11] "There was not the slightest intimation of impatience with the minority, nor any words that could be construed as a threat or even an expression of displeasure." United States v. Sawyers, 423 F.2d 1335, 1340 (4th Cir. 1970). Where, as here, the judge "urges further deliberation in an effort to agree upon a verdict, and in doing so [her] comments are balanced and not slanted toward conviction, we are unable to perceive harm to the defendant." Id. at 1342.[12]

---

[11] Thus the judge instructed, consistent with Rodriquez, that "jurors for conviction ought seriously to ask themselves whether they may not reasonably doubt the correctness of a judgment which is not concurred in by others with whom they are associated and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellow jurors."

[12] The judge did not ask the jury to tell her how they were numerically divided, which is impermissible. See Brasfield v. United States, 272 U.S. 448, 450 (1926); United States v. Parsons, 993 F.2d 38, 42 (4th Cir. 1993), and cases cited. The

4. Appellate counsel's request for copy of entire trial file. We find no basis to reverse the conviction on the ground that the trial judge did not allow appellate counsel's request for a copy of "the entire court file." The judge did not abuse her discretion in denying the request, without prejudice, and requiring appellate counsel ease the burden on the clerk's office by making some effort "to identify particular pleadings that are reasonably relevant to potential appeal issues."[13] We do not read Fitzgerald v. District Court Dept. of the Trial Court, 471 Mass. 1001 (2015), as creating a rule of general application requiring clerks' offices to provide every defendant with "a copy of the entire record." See id. at 1002 ("If for any reason the District Court clerk's office has not provided him with a copy of the entire record, he is of course entitled

---

better practice -- especially after the jury had revealed its numerical division in the first note -- would have been to instruct the jury "never to reveal to any person -- not even to the Court -- how the jury stands, numerically or otherwise, on the questions before you, until after you have reached a unanimous verdict." 3 E.J. Devitt, C.B. Blackmar, & M.A. Wolff, Federal Jury Practice & Instructions, Civil § 74.08 (4th ed. 1987). See United States v. Hotz, 620 F.3d 5, 7 (1st Cir. 1980). To the extent the defendant asks us to make a rule that judges must instruct jurors never to communicate how they are split, we lack the authority to impose such a prophylactic rule.

[13] The judge observed that this case had "a long, long docket," and that counsel's request included copies of "meaningless" papers such as requests for minor expenses that had been allowed. Nothing prevented appellate counsel from inspecting the file in the clerk's office and determining whether such documents truly contained relevant information.

to have it upon a proper request and the payment of any applicable costs of reproduction").  The requirement of a proper request and the payment of costs implies some degree of reasonableness upon such requests.  See G. L. c. 261, § 27C(4) (indigent litigant entitled to any "document, service or object" that the court finds "reasonably necessary to assure the applicant as effective a prosecution, defense or appeal as he would have if he were financially able to pay").  In any event, the numerous pretrial hearings, trial, and posttrial transcripts and the voluminous record appendix filed in this appeal belie any suggestion that the clerk's office failed to cooperate with appellate counsel.

Judgments affirmed.
