COMMONWEALTH *vs.* CHARLES R. JENKINS.

No. 91-P-1233.

Suffolk. October 14, 1992. - February 18, 1993.

Present: PERRETTA. FINE. & GILLERMAN. JJ.

Further appellate review granted, 414 Mass. 1106 (1993).

*Jury and Jurors. Practice, Criminal,* Deliberation of jury. *Identification. Evidence,* Identification, Prior inconsistent statement, Testimony at prior proceeding.

At the trial of a criminal case in which the judge required the jury to continue with their deliberations after they had returned to the courtroom twice without a verdict, the judge's action amounted to coercion of the jury, as prohibited by language in G. L. c. 234, § 34, where, in light of the jury's lengthy deliberations, the judge's repeated instructions on the same points of law and his twice instructing them in accordance with *Commonwealth* v. *Rodriquez,* 364 Mass. 87 (1973); the jury's numerous statements of frustration; and their repeated failure to reach a verdict, it could not be concluded that unanimity had been reached in accordance with the letter and the spirit of the statute when the jury finally did return with their verdict. [141-144]

Prior inconsistent statements of a witness at a probable cause hearing during grand jury proceedings, which the witness acknowledged she believed to be true when she made them, would be admissible in evidence for their probative value at the retrial of a criminal case, provided the judge could conclude that the conditions set forth in *Commonwealth* v. *Daye,* 393 Mass. 55 (1984), had been met. [144-145]

At the trial of a criminal case, evidence of attempts to intimidate a certain witness would not be rendered inadmissible by the fact that the defendant could not be shown to have played any part in such acts. [145-146]

INDICTMENT found and returned in the Superior Court Department on November 14, 1988.

The case was tried before *Robert A. Mulligan,* J.

*Willie J. Davis* for the defendant.

*Nijole Makaitis,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On the night of June 6, 1988, Anthony Graves confronted and reproached a large group of teenagers

for throwing bottles at five girls as they walked along the street. An argument ensued and one of the group stabbed and killed him. The defendant was identified as the assailant. On appeal from his conviction for murder in the second degree, the defendant's principal contention is that the trial judge violated G. L. c. 234, § 34, by requiring the jury to continue with their deliberations after they had returned to the courtroom twice without a verdict. We conclude that the defendant's request for a mistrial should have been granted and reverse the conviction.

1. *The evidence.* About 10:00 P.M., June 6, 1988, five girls were walking in the Blue Hill Avenue area of the Mattapan section of Boston.[1] As they came to the corner of Landor Street and Blue Hill Avenue, they saw the victim talking with a friend. The girls knew the victim, and greetings were exchanged. After a brief and friendly conversation, the girls continued walking along Blue Hill Avenue.

Up ahead in front of a pizza shop, there was a group of about twenty-five to thirty teenagers, mostly males, listening to a loudly playing radio. All four of the girls who testified stated that the defendant was standing in this group and that he was wearing a red shirt. As the girls came closer to the crowd, someone threw a bottle which landed on the sidewalk in front of them. One of the girls demanded to know who had thrown the bottle. When no one responded, she reprimanded them. Her sister ran back to the corner and told the victim what was happening.

Going to the aid of the girls, the victim walked up to the crowd, asked them to turn off the radio, and told them to stop throwing bottles at the girls. The defendant took offense at the victim's remarks which he believed had been directed at him alone. The victim explained that he was speaking to the entire group. Nonetheless, an argument between the defendant and the victim ensued. The defendant began to gesticulate and advance toward the victim.

---

[1]The girls were between the ages of fourteen and twenty. Four of them were witnesses for the Commonwealth, and the fifth did not testify.

As the argument escalated, the girls withdrew and started down Blue Hill Avenue. Someone known to the girls approached and told one of them, Debra Howard, that she was wanted at home. Leaving her friends, Debra turned back up Blue Hill Avenue toward the scene of the argument. The crowd was still there, but they had become very quiet. When Debra was only three or four feet away from the throng, the crowd parted. She saw that the victim had been stabbed.

Debra turned and ran across Blue Hill Avenue toward her friends. The defendant was running behind her. He was the only member of the crowd to flee. As Debra ran, she was pointing at the defendant and crying that he had just stabbed the victim. The defendant veered off his course and ran across Morton Street. As he ran, his right arm was moving with his gait. His left arm was rigid at his side. One of the girls testified that the defendant had a knife. She began to chase after him. She stopped her pursuit at a dark side street when she realized the danger in what she was doing.

That night and the next day, Debra and one of her friends identified the defendant as the man who killed the victim. The defendant took a bus to Florida the day after the stabbing. He was arrested there on July 17, 1988. After being advised of his Miranda rights, the defendant stated that he knew that the victim was dead and that the police were looking for him. The defendant was returned to Massachusetts.

After a probable cause hearing, the defendant was bound over to the grand jury. At both these proceedings, Debra testified that she saw the defendant pull a knife from the victim's chest. At trial, however, she testified only that she saw a man in a red shirt pull the knife from the victim's chest, but she could not identify the defendant as being the victim's assailant. Her conflicting statements from the prior proceedings were admitted in evidence for their full probative value. The Commonwealth was also allowed to question Debra about statements made to her by people who did not want her to testify. She related that people she knew, including her mother, had told her not to testify and that something had been done to her house. She insisted, however, that these

events had nothing to do with the inconsistency between her prior and present testimony concerning her identification of the defendant.

Mistaken identity was the theory of defense. Although the girls all testified to the effect that they saw the defendant with the knife after the stabbing as he ran behind Debra and that they heard Debra screaming, "He stabbed Tony," Debra was the only witness to testify that she saw anyone pull a knife from the victim's chest. The defendant attributed the girls' statements to the police and the selection of his photograph from an array to the fact that he was from their neighborhood and familiar to them.

Timothy Biggs testified that he and the defendant were among the crowd confronted by the victim. He estimated that the argument and stabbing happened sometime between 6:00 and 7:00 P.M. The defendant was wearing "blue shorts, and he didn't have on a shirt." The witness described the assailant, whom he did not really know, as "about 5'11, heavy build, kind of muscular body-wise . . . kind of dark complexioned . . . big," and wearing a "reddish-maroon shirt with white writing and blue jeans."

Biggs acknowledged that he was still present at the scene when the police arrived. Because they did not speak with him, Biggs did not give them his name or tell them what he had seen. Although he thereafter knew that the defendant had been accused of the stabbing and that the police were looking for him, Biggs told only the girls that the defendant was not the assailant. He explained that he did not seek out or go to the police because he minds his own business. He did not even try to speak with the defendant until a week before the commencement of trial. At that time, he visited the defendant in jail for about twenty minutes.

2. *The deliberations.* There were four possible verdicts for the jury to consider: murder in the first or second degree, manslaughter, and not guilty. Because they began their deliberations late in the day, 3:20 P.M., the judge allowed the jury to adjourn after about two hours. After almost seven hours of deliberations on the second day, the jury sent the

judge a note which read: "The jury has voted three times. The jury has not reached a verdict. No one on the jury is prepared to change their vote at this time. The jury would like instructions at this time for a continued course of action." Over the defendant's objection, the judge instructed the jury consistent with the language set out in *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-102 (1973). After that instruction, the jury deliberated for about an hour and one-half when the judge sent them a note asking whether they wished to continue into evening or adjourn and return the next morning. They elected to stop at 6:00 P.M., and resume the next day at 9:00 A.M. Thus far, the jury had been deliberating for about ten and one-half hours.

Deliberations had run about forty-five minutes on the third day when the jury sent the judge a request that he "restate and redefine the possible verdicts." The judge again delivered the pertinent instructions, and the jury returned to their task. After about three and one-half hours, they sent another communiqué: "The jury has voted seven times. The jury has not reached a verdict. The jury requests further clarification of the phrase 'deliberate premeditation.' Please respond in court, or in writing, or suggest a further course of action. The jury offers more information if requested by the judge." The judge called the jury to the courtroom and defined "premeditation" for them by essentially repeating his earlier instructions.

A little over an hour later, at 3:35 P.M., after a total of almost fifteen hours of deliberation over two and one-half days, the judge received the following note from the jury: "The jury has voted eight times. The jury has not reached a verdict. Deliberation[s] have at times become heated. Each juror has expressed their vote as their own best decision. Each juror has said they do not wish to change their vote. The jury requests that the judge suggest a further course of action. Some members have requested [a] release from the trial."

The defendant, citing the length of the deliberations and the substance of their notes to the judge, moved for a mis-

trial. He construed the jury's most recent message to the judge as a statement that they had reached an impasse. The judge, however, focused on the jury's request that he "suggest a further course of action" and concluded that they were not deadlocked. The judge had the jury brought to the courtroom, and over the defendant's objection, he delivered what he described to counsel as a "mini-*Tuey*" charge. He advised the jury that his suggested course of action was that they "continue to deliberate, attempt to make progress." They were further informed that if after more deliberation, there was neither progress nor hope of any, then they could inform him of that fact. One juror attempted to say something, but the judge informed him that there could be no individual questions by jurors. The jury returned to their deliberations. The judge suggested to counsel, based upon the "looks on some of the faces of the jurors or given the fact that one juror wanted to say something to me right then and there," that the jury might return in the "not too distant future" and they should not go "too far."

It was no more than fifteen minutes before the jury again wrote to the judge: "Deliberation[s] continue to be frustrating, heated and emotional. [The] jurors feel there is no hope of progress. [The] jurors have expressed this very strongly. [The] jurors feel there are no new issues to be discussed, and are frustrated discussing the same issues. The jury requests from the judge further instructions." With this note, the judge ruled that, under G. L. c. 234, § 34, he could not allow the jury to continue to deliberate without their consent.

At 4:15 P.M., the judge told the jury that he could not require them to continue deliberating without their agreement and instructed them as follows: "If you agree to, I would have you adjourn for today and come back tomorrow and resume your deliberations tomorrow morning. If you, the jury, don't agree to do that, if you don't consent to do that, then I will not do that. I would ask you to go up and discuss that matter with a view toward whether or not further deliberations could be fruitful. Write out your answer to me, and

at that point I'll make my decision." The jury returned with its verdict fifteen minutes later.

3. *The verdict.* "General Laws c. 234, § 34, stands guard to prevent jurors, after 'due and thorough' deliberations, from being coerced into reaching a verdict in the face of views conscientiously reached and held." *Commonwealth* v. *Winbush*, 14 Mass. App. Ct. 680, 682 (1982). *Commonwealth* v. *Valliere*, 366 Mass. 479, 495-496 (1974). The statute provides: "If a jury, after due and thorough deliberation, return to court without having agreed on a verdict, the court may state anew the evidence or any part thereof, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law."

It is not until a judge determines, as matter of discretion, that the jury's deliberations have been "due and thorough" that a jury's return counts under the statute. Here the jury had deliberated about nine hours and had voted three times without a verdict before they returned to the courtroom. Perhaps because hours later the jury requested a restatement of the possible verdicts and again, after voting seven times, a "further clarification of the phrase 'deliberate premediation,' "[2] the judge thereafter did not include this earlier return in considering whether he could require the jury to deliberate further.

On that return, however, the judge did give the jury the charge approved in *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-102 (1973). Although the decision to give the *Rodriquez* charge is a matter within the judge's discretion, the charge may not "be used prematurely or without evident cause." *Id.* at 100. We think it implicit in the fact that the judge gave the charge that he had concluded that the deliberations had been "due and thorough." *Commonwealth* v. *Valliere*, 366 Mass. 479, 495-496 (1974). Compare *Com-*

---

[2]Because the purpose of these two returns was to seek "some further explanation of the law," the statute exempts them from the count.

monwealth v. *Winbush*, 14 Mass. App. Ct. at 682.[3] It was error later to ignore this return.

After hearing the *Rodriquez* charge, the jury deliberated an additional six hours (with interruptions for reinstructions on the possible verdicts and supplemental instructions on premeditation, see note 2, *supra*) before returning to the courtroom for a second time without a verdict. Because the judge construed the jury's request that he "suggest a further course of action" to mean that they were not "hopelessly deadlocked," he denied the defendant's motion for a mistrial, gave the jury an abbreviated *Rodriquez* charge, and sent them back to deliberate without their consent.

Although the jury did not use the phrase "hopelessly deadlocked" in their note to the judge in which they advised him that they could not reach a verdict, we see no magic in those words. Nor do we attach any ameliorating significance to the jury's request that the judge "suggest a further course of action." All their notes, including those in which they sought guidance on points of law, signed off in that manner. The course of action suggested by the judge, to give the *Rodriquez* charge for the second time, was no more than a directive that they should continue to try to agree. Compare *Commonwealth* v. *Connors*, 13 Mass. App. Ct. 1005, 1006 (1982), where the judge gave the jury the *Rodriquez* charge, they deliberated for three hours and suspended for the night,

---

[3]*Valliere* was a complicated case which rested upon circumstantial evidence, the testimony of seventy-eight witnesses, and over 250 exhibits. After about six and one-half hours of deliberations and without any indication of an inability to reach a verdict, the jury asked the judge to read again his instructions concerning circumstantial evidence and reasonable doubt. Although there were signs of trouble the next day, the judge did not give the "*Tuey* charge" until that afternoon, when the jury sent word that "further discussion [was] useless." In *Winbush*, the trial judge informed the jury upon their return after about only twenty-five minutes of deliberation that the " 'period of time in which you announced an inability to resolve this [case] is not adequate' " and briefly instructed them that although they "were not required to reach a verdict, they were obliged to make a reasonable effort to do so." On appeal, we concluded that the jury's return did not count under § 34.

and the judge gave the charge again in the morning, sua sponte, before sending the jury off to work.

Although a violation of the statute is conclusive on a claim of a coerced verdict, the converse does not follow. Even had we concluded that the jury's first nine hours of deliberations were not "due and thorough" and that their return at that time was of no consequence under the statute, we nonetheless would consider that return and give it some weight in deciding whether the verdict had been coerced irrespective of the number of times the jury had returned without agreement.

We also look to the "complexity of the case, the extent of evidentiary conflict on material issues, and the total length of time the jury has spent in attempting to resolve those conflicts." *Commonwealth* v. *Winbush*, 14 Mass. App. Ct. at 682. Here, both the evidence and the jury's requests for additional instructions on the verdicts and the law provide strong indication that their inability to be unanimous was more attributable to the nature of the defendant's act rather than to his identification. Debra Howard's prior identifications had probative value, and there was evidence to show that her trial testimony could have been the result of intimidation. Further, there was testimony to show that the defendant was the only member of the crowd to flee and that he was running with a knife in his hand. The jury were twice instructed on the possible verdicts and the requirements for each. They were instructed a total of three times on premeditation.

Moreover, the jury described their deliberations in their notes to the judge as "heated," "frustrating," and "emotional." They declared their inability to agree in strong terms: "Each juror has expressed their vote as their own best decision," and "[e]ach juror has said they do not wish to change their vote."

As noted by the judge after the second *Rodriquez* charge, some of the jurors made facial expressions of impatience and one attempted to speak directly to him.

Fifteen minutes later, at 4:15 P.M., the jury returned a third time stating, in emphatic language, that they could not reach a verdict: "Deliberation[s] continue to be frustrating,

heated and emotional. [The] jurors feel there is no hope for progress. [The] jurors have expressed this very strongly. [The] jurors feel there are no new issues to be discussed, and are frustrated discussing the same issues. The jury requests from the judge further instructions."

With this note, the judge informed the jury that the law did not allow him to require them to continue with their deliberations without their agreement. He instructed: "If you agree to, I would have you adjourn for today and come back tomorrow and resume your deliberations tomorrow morning. If you, the jury, don't agree to do that, if you don't consent to do that, then I will not do that. I would ask you to go up and discuss that matter with a view toward whether or not further deliberations could be fruitful. Write out your answer to me, and at that point *I'll make my decision*" (emphasis added).

The judge's earlier statement to the jury, that the "law does not permit me to send you out again, given the state of your questions, unless you agree to continue deliberations in the case," was compromised once he alerted them to the fact that he intended to have a say in the matter. In light of the substance of their previous unavailing notes to the judge, it is possible that the jury wondered whether the judge, in making his decision, would accept their assessment as to whether "further deliberations could be fruitful." They had informed him just minutes before that they strongly believed that there was no hope for progress. The fact that they were back in the courtroom with a verdict within fifteen minutes points to coercion.

Upon consideration of all the circumstances (lengthy deliberations, repeated instructions on the same points of law, two *Rodriquez* charges, numerous statements of frustration, three returns without a verdict), we are unable to conclude that unanimity was reached in accordance with the letter and the spirit of the statute.

4. *Issues likely to recur at retrial.* It is likely that Debra Howard will be called by the Commonwealth at retrial. As previously recited, she testified at the defendant's probable

cause hearing that she saw the defendant pull a knife out of the victim's chest, and she told the grand jury that she saw the defendant stab the victim. At trial, however, she testified that she could no longer state that it was the defendant who stabbed the victim. She knew only that the assailant had on a red shirt, as did the defendant and others in the crowd. Debra acknowledged her prior testimony and stated that she believed the truth of those statements at the time that she made them. However, after speaking with the other witnesses the very morning of her trial testimony, she could no longer state with certainty that the defendant stabbed the victim. The only fact about which she was certain was that the victim's assailant was wearing a red shirt.

For the reasons discussed in *Commonwealth* v. *Daye*, 393 Mass. 55 (1984), and *Commonwealth* v. *Fort*, 33 Mass. App. Ct. 181 (1992), Debra's testimony at the probable cause hearing and grand jury proceedings will be admissible for its probative value should the judge conclude that the conditions of the *Daye* decision have been met. *Id.* at 186. There is nothing in *Commonwealth* v. *Amado*, 387 Mass. 179, 186-189 (1982), which would preclude that prior testimony from having probative value. There the witness testified at trial that he never made any pretrial identification of the defendant and that the defendant was not the killer. Because there was no evidence, other than the witness's disputed extrajudicial identification, to show that the defendant was the murderer, the court concluded that it was error to deny the defendant's motion for a required finding of not guilty. In the present case, Debra acknowledged her prior testimony. Five witnesses testified to the defendant's presence in the crowd and to his argument with the victim, four stated that he fled from the scene, and one stated that he held a knife as he fled. This testimony is sufficient to satisfy the Commonwealth's burden of "produc[ing] identification evidence in addition to a prior inconsistent statement. . . ." *Commonwealth* v. *Daye*, 393 Mass. at 74.

There was evidence of intimidation of Debra. The fact that it cannot be shown that the defendant played any role in

those acts does not require exclusion of the evidence. See *Commonwealth* v. *White*, 367 Mass. 280, 283 (1975); *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 415-416 (1978).

As the defendant's remaining claims are not likely either to recur or to recur in the same context at retrial, we do not discuss them.

5. *Conclusion.* The judgment is reversed, the verdict set aside, and the matter is remanded to the Superior Court for a new trial.

*So ordered.*