COMMONWEALTH *vs.* CHARLES R. JENKINS.

Suffolk. October 5, 1993. - January 10, 1994.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Jury and Jurors. Practice, Criminal,* Deliberation of jury. *Identification. Evidence,* Testimony at prior proceeding, Identification, Prior inconsistent statement. *Practice, Criminal,* Instructions to jury.

At the trial of a criminal case, the jury, fully informed by the judge that the law allowed them to terminate deliberations and go home, agreed to continue deliberations and promptly reached a verdict; in the circumstances, the jury were not coerced into reaching a verdict and neither the letter nor the spirit of G. L. c. 234, § 34, was violated. [739-741] LIACOS, C.J., dissenting.

Although it would have been preferable for the judge at a criminal trial to instruct the jury that they were to draw "no adverse inference" from the fact that the defendant did not testify, the judge's instruction to the jury that "[t]he fact that the defendant did not testify is absolutely not to be considered by you in your deliberations in this case" was not error requiring reversal. [741]

At a criminal trial, the judge did not abuse his discretion in asking the jury for their collective, oral response when defense counsel asked that the jury be polled, even though a show of hands would have been better than a voice vote. [741]

INDICTMENT found and returned in the Superior Court Department on November 14, 1988.

The case was tried before *Robert A. Mulligan,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Willie J. Davis* for the defendant.

*Kenneth H. Anderson,* Assistant District Attorney, for the Commonwealth.[1]

---

[1]Ms. Nijole Makaitis, an assistant district attorney, was appellate counsel for the Commonwealth, but died before the date of oral argument. — REPORTER.

WILKINS, J. We granted further appellate review in this case to consider the Commonwealth's challenge to the Appeals Court's determination in *Commonwealth* v. *Jenkins*, 34 Mass. App. Ct. 135, 144 (1993), that it was "unable to conclude that unanimity [of the jury] was reached in accordance with the letter and the spirit of" G. L. c. 234, § 34 (1992 ed.). As a guard against the coercion of a jury to reach a verdict, § 34 limits the circumstances under which a judge may require a jury to continue deliberations.[2]

If, after due and thorough deliberation, the jury twice advise the judge that they are unable to reach a verdict, the judge may not properly send the jury out again without their consent, unless the jury ask for some further explanation of the law. G. L. c. 234, § 34. Section 34 "stands guard to prevent jurors . . . from being coerced into reaching a verdict in the face of views conscientiously reached and held." *Commonwealth* v. *Winbush*, 14 Mass. App. Ct. 680, 682 (1982). See *Lambright* v. *State*, 34 Fla. 564, 574 (1894) (similar statute confers legal right on juries to be free from coercion); *State* v. *Simon*, 126 S.C. 437, 444 (1923) (similar statute confers right on juries to indicate when they believe that deliberations have been due and thorough and that they are unwilling to deliberate further); *State* v. *Stephenson*, 54 S.C. 234, 238-239 (1899) (intent of statute is to prevent verdicts coerced by confinement of jury); *Douglass* v. *State*, 4 Wis. 387, 393 (1854) (similar provision was intended for protection of jury).[3] Under early English law, juries could be co-

[2]Section 34 reads as follows: "If a jury, after due and thorough deliberation, return to court without having agreed on a verdict, the court may state anew the evidence or any part thereof, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law."

[3]At one time, there were at least three other States with statutes substantially identical to G. L. c. 234, § 34: South Carolina (S.C. Code Ann. § 14-7-1330 [Law Co-op. 1977]), Florida (Fla. Stat. ch. 54.22 [1965]), and Wisconsin (Wis. Stat. § 270.23 [1973]). The Florida provision was repealed in 1967 (Fla. Laws 1967, ch. 67-254, § 49), and the Wisconsin

erced into agreement by withholding "meat, drink, fire, or candle, unless by permission of the judge, till they [were] all unanimously agreed." 3 Blackstone, Commentaries *375. No doubt this practice had been abandoned by 1836, when the first predecessor of § 34 appeared in substantially its present form. See Rev. Stat. (1836) c. 95, § 32. See also St. 1807, c. 140, § 15 (similar provision applicable only to civil juries). But even as late as 1924, it was held that a Massachusetts civil jury were not coerced when they were obliged to deliberate continuously for almost twenty-three hours (except for time for meals and a short walk) without sleeping accommodations. See *Dixon* v. *A.J. Cunningham Co.*, 257 Mass. 63, 69-71 (1926).

We conclude that the jury were not coerced to reach a verdict and thus the spirit of § 34 was not violated. Moreover, because the jury consented to the continuation of their deliberations, neither the spirit nor the letter of § 34 was violated.

We shall discuss the three returns of the jury that are significant.[4] We accept the Appeals Court's view that, where there is nothing to indicate the contrary, the giving of a *Rodriquez* charge on the first return of the jury that is significant for our purposes (*Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-102 [1973]) implied that the judge had concluded that the jury's deliberations were "due and thorough," in the words of § 34. Cf. *Commonwealth* v. *Valliere*, 366 Mass. 479, 496 (1974) (judge was warranted in concluding that jury's deliberation was not "due and thorough," although jury had deliberated for thirteen hours). We also agree that, where at that time the jury made no request for a further explanation of the law, the jury's return without a verdict was the first of the two returns without a verdict to which § 34 refers.

---

provision in 1976 (repealed by Supreme Court Order, 67 Wis. 2d 585, 760 [1976]).

[4]Other postcharge jury communications between the jury and the judge are set forth in the Appeals Court opinion. *Commonwealth* v. *Jenkins*, 34 Mass. App. Ct. 135, 138-141 (1993).

The first issue for our close attention arises from the jury's note to the judge sent after the return we have just discussed and after almost fifteen hours of deliberation. In that note the jury said: "The jury has voted 8 times. The jury has not reached a verdict. Deliberation[s] have at times become heated. Each juror has expressed their [*sic*] vote as their [*sic*] own best decision. Each juror has said they [*sic*] do not wish to change their [*sic*] vote. The jury requests that the judge suggest a further course of action. Some members have requested release from the trial." Defense counsel moved for a mistrial, arguing that the jury were at an impasse. The judge responded that the note did not state that the jury were hopelessly deadlocked. He fastened on the jury's request for a suggestion for a further course of action. After hearing the views of the prosecutor, the judge stated that he did not think that the note required him to discharge the jury and declare a mistrial. Then, for the first time someone, the judge, not defense counsel, referred to § 34. The judge stated: "I don't think this note satisfies the provision of Chapter 234, section 34, relative to not being able to send the jury out more than twice unless the jurors so consent." The judge decided to give the jury "a mini-*Tuey* charge" and did so.

Fifteen minutes later the jury sent their final note to the judge in which they indicated that they felt strongly that there was no hope of progress and requested further instructions. The judge concluded that under § 34 he could not force them to deliberate further without their consent. He then told the jury that the law did not permit him to send them out again, unless they agreed to continue deliberations in the case. "I cannot force you to continue deliberations unless you agree to continue deliberations. That's what the law states." He then asked the jury to retire and decide whether further deliberations on the next day would be fruitful. "Write out your answer to me, and at that point I'll make my decision." Fifteen minutes later the jury came back with a verdict of guilty of murder in the second degree.

The significant point here is that, fully informed that the law allowed them to terminate deliberations and go home, the jury agreed to continue deliberations, did so, and promptly reached a verdict. The object of § 34 was fulfilled because the jury consented to continue their work. Even if the judge was wrong in rejecting the next prior note as a second statutory return that triggered the requirement of the jury's consent (a point we need not decide), the jury's return of a verdict after sending their last note implicitly satisfied the statutory requirement of jury consent.

We turn to the question whether, quite apart from § 34, the jury were coerced into a verdict. What we have already said points to a negative answer to that question. The jury knew that at last, if they wished, they could go home without reaching a verdict. The law allowed them to do so. The judge explicitly told the jury what the law permitted and that he had no control over them. The judge's statement that, after the jury had decided whether they wanted to continue, he would make his decision does not detract from the jury's right to stop deliberations. His decision would be, he said it had to be, that if they wanted to go home, they had the right to do so. We disagree with the Appeals Court's view that the judge indicated to the jury that he had a say in the matter if they wanted to go home.

The fact that the jury returned fifteen minutes later with a guilty verdict does not point to coercion. It suggests instead that a jury who knew that they did not have to return a verdict did so voluntarily. It is not likely, moreover, that jurors who had stood adamantly divided for two days, unwilling to break the deadlock, would suddenly and involuntarily coalesce on a verdict when they had just learned that they could walk away from the task unless they all agreed to continue.[5]

---

[5]We agree with the Appeals Court's conclusion that the jury's problem was not whether the defendant was the person who committed the unlawful act but, rather, whether the defendant's act should be viewed as manslaughter or murder and, if murder, in what degree. See *Commonwealth* v. *Jenkins, supra* at 143. One supposition, the most likely, is that the jurors who were holding out for murder in the first degree gave in at the last

In matters of this sort we give substantial weight to the discretion of the trial judge who was fully alert to the issues of coercion and the jury's right to call it quits.

We agree with the Appeals Court's treatment of other issues, those that it identified as likely to arise at the new trial that it had ordered. *Commonwealth* v. *Jenkins, supra* at 144-146. As to the admissibility of the testimony of the witness Debra Howard at the defendant's probable cause hearing and before the grand jury, see also the discussion in *Commonwealth* v. *Tanso,* 411 Mass. 640, 646-649 (1992).

We are left with two issues that the Appeals Court did not consider because they were not likely to arise at the anticipated new trial. The defendant requested that the judge instruct the jury that "[n]o adverse inference against him may be drawn by you because he did not take the witness stand." The judge instead told the jury that "[t]he fact that the defendant did not testify is absolutely not to be considered by you in your deliberations in this case." A reference to "no adverse inference" is the preferable form, but the judge's words are not grounds for reversible error. See *Commonwealth* v. *Thomas,* 400 Mass. 676, 679-680 (1987). Cf. *Commonwealth* v. *Feroli,* 407 Mass. 405, 410-411 (1990) (G. L. c. 278, § 33E, review).

The judge did not abuse his discretion in asking the jury for their collective, oral response when the defense asked that the jury be polled. The judge ruled that each juror had answered resoundingly in agreement with the verdict. A show of hands would be better than a voice vote, however, when a judge declines a request to poll the jurors individually.

*Judgment affirmed.*


Liacos, C.J. (dissenting). General Laws c. 234, § 34 (1992 ed.), provides: "If a jury, after due and thorough de-

---

minute when they saw the prospect of no conviction and a new trial. We do not know, of course, what issue divided the jury. Our decision does not rely on any supposition on this point.

liberation, return to court without having agreed on a verdict, the court may state anew the evidence or any part thereof, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law."

In light of the statute, I cannot agree with the court's opinion on the issue of jury coercion. To analyze whether there was coercion of the jury in this case, I must summarize in some detail the jury deliberations. The jury deliberated over the course of three days. After deliberating for approximately two hours on the first day and seven hours on the second day, the jury sent the judge the first of three notes which concern us (note A): "The jury has voted 3 times. The jury has not reached a verdict. No one on the jury is prepared to change their vote at this time. The jury would like instructions at this time for a continued course of action." The note was signed by the foreman of the jury. The jury returned to the courtroom. Over objection by the defendant, the judge instructed the jury in accordance with *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-102 (1973), and sent them back to the jury room for further deliberation. The jury deliberated for approximately one and one-half hours, and then the judge sent them home for the day.

On the third day of deliberations, the jury deliberated less than one hour and then sent the judge a note requesting instructions on the possible verdicts in the case. The judge reinstructed the jury accordingly and sent them back to the jury room. After three more hours, the jury sent the judge another note requesting instructions on deliberate premeditation,[1] which he gave and then sent them back to the jury room.

---

[1] This note does not fall within the scope of G. L. c. 234, § 34, because it asks a question of law. This note is relevant, however, in the broader analysis whether there was any coercion of the jury within the meaning of the type of coercion described by § 34. The note read: "The jury has voted 7 times. The jury has not reached a verdict. The jury requests further clarifi-

A mere one hour later, the jury sent the judge another note, the second of the notes which concern us (note B). This note came after the jury had been deliberating for approximately fifteen hours over the course of three days. It read: "The jury has voted 8 times. The jury has not reached a verdict. Deliberations have at times become heated. Each juror has expressed their vote as their own best decision. Each juror has said they do not wish to change their vote. The jury requests that the judge suggest a further course of action. Some members have requested release from the trial." The note was signed by the foreman.

At this point, defense counsel moved for a mistrial. The judge refused and stated:

> "I don't think that this note in its present form, as I interpret it, especially in light of the sentence, 'The jury requests the judge suggest a further course of action,' I don't think that this note requires that I discharge this jury and declare a mistrial.
>
> "I don't think this note satisfies the provisions of [G. L. c. 234, § 34], relative to not being able to send the jury out more than twice unless the jurors so con-

---

cation of the phrase 'deliberate premeditation.' Please respond in court, or in writing, or suggest a further course of action. The jury offers more information if requested by the judge."

The last two lines of the note suggest that the jury were attempting to do more than merely obtain a further explanation of "deliberate premeditation," because if that is all they wanted, they would not have asked the judge to "suggest a further course of action" as they likewise did in notes A, B, and C (B and C are described, *infra*), and would not have offered "more information if requested by the judge." Compare the jury's second note, the entire text of which was as follows: "The jury has not reached a verdict. The jury requests that the judge re-state and re-define the possible verdicts in this case." Given the context in which this note was written, these last two lines may have been intended as a further indication to the judge that the jury were at an impasse. I do not suggest that this note alone clearly should have informed the judge that the jury were deadlocked. I do suggest, however, that this note, in conjunction with notes A, B, and C, demonstrates that the jury were attempting to communicate to the judge, albeit in their own terms and not in the language of lawyers, that they were deadlocked.

> sent. I don't think that this indicates to me that the ju-
> rors are hopelessly deadlocked. The jury specifically re-
> quests some guidance from me relative to a further
> course of action.
>
> "I'm going to speak to them and I'm going to give
> them a mini-*Tuey* charge. I'm going to tell them to go
> up and to continue to deliberate. Should I get another
> note indicating they are deadlocked, I suppose then at
> that point I'll take up the issue [of mistrial]."

Once again, the jury returned to the courtroom. The judge
gave a "mini-*Tuey*" charge (see *Commonwealth* v. *Tuey*, 8
Cush. 1, 2-4 [1851]) and then told the jury, regarding a fur-
ther course of action, that they should "continue to deliber-
ate, attempt to make progress. If there be no progress and if
you determine that there does not appear to be any hope of
progress, then so inform me." The judge then sent the jury
back to the jury room, noting the defendant's objection to
their being sent out again.

Within just fifteen minutes, the jury sent the judge another
note, the third note which concerns us (note C). This note
read as follows: "Deliberations continue to be frustrating,
heated, and emotional. Jurors feel there is no hope of prog-
ress. Jurors have expressed this very strongly. Jurors feel
there are no new issues to be discussed, and are frustrated
discussing the same issues. The jury requests from the judge
further instructions."

The judge informed the prosecutor and defense counsel
that it was clear the jury did not have a question of law, so at
this point he must inform the jury, in accordance with G. L.
c. 234, § 34, that he could not send them out again unless
they consented to further deliberations. The jury returned to
the courtroom and the judge addressed them:

> "The law does not permit me to send you out again,
> given the state of your questions, unless you agree to
> continue deliberations in the case. So, at this point in
> the trial I cannot force you to continue deliberations un-

less you agree to continue deliberations. That's what the law states.

"So, this is what I shall say to you. If you agree to, I would have you adjourn for today and come back tomorrow and resume your deliberations tomorrow morning. If you, the jury, don't agree to that, if you don't consent to do that, then I will not do that. I would ask you to go up and discuss that matter with a view toward whether or not further deliberations could be fruitful. Write out your answer to me, and at that point I'll make my decision."

The jury returned to the jury room, and within fifteen minutes returned to the courtroom with a verdict of guilty of murder in the second degree.

The court concludes there was no violation of G. L. c. 234, § 34, because of its view that the jury implicitly consented to further deliberation after sending note C to the judge, *ante* at 740, and also finds no other coercion, *ante* at 740. I disagree on both points.

The language of G. L. c. 234, § 34, is clear: "if [the jury] return a second time without having agreed on a verdict, they *shall not be sent out again* without their own consent, unless they ask from the court some further explanation of the law" (emphasis added). Despite this language, however, the court concludes that it need not decide whether the return following note B triggered this statutory mandate. On the contrary, the issue whether that return invoked the statute is the heart of the matter. If that return did invoke the statute, the jury should not have been "sent out again" and would not have had the opportunity to write note C.

While I agree that the return following note A came within the scope of § 34, I do not agree with the court that note B is unimportant in our analysis.

The trial judge attached importance to the inclusion in note B of the line "[t]he jury requests that the judge suggest a further course of action," presumably interpreting this as a request for instruction on the law. With the exception of the

note requesting instruction on the possible verdicts, however, all notes from the jury to the judge included a similar line, including notes A, C, and the final note which informed the judge that they had reached a verdict. Furthermore, in response to note B, as in response to note A, the judge did not give instructions on any relevant law, but instead gave an instruction in accord with *Rodriquez, supra.*[2] In addition, notes A and B contained other similar language, but the language in note B was more emphatic: note A indicated that the jury had voted three times while note B indicated eight votes; note A stated that no juror was prepared to change his or her vote "at this time" while note B stated without qualification that no juror wished to change his or her vote.

All that the statute requires is that, after due and thorough deliberation, the jury twice return to court without having reached a verdict. It does not require that the jury use words of particular legal significance. It does not require the jury to say that they are "hung," deadlocked, or at an impasse: it calls for no magical phrase but instead merely requires them to return to court without a verdict and with no question of law. I conclude that this is exactly what the jury did after note B. By responding to note B in the same way he responded to note A, the judge treated the return after note B as a return without a verdict and with no question of law, even though he stated that this was not so.

At this point, the statute was invoked, and it was error to send the jury out again without their consent. Consent following a later return (the return after note C), if any such consent really was given by the jury, cannot relate back and

---

[2]The judge concluded that the return of the jurors after note C required the consent of the jurors for further deliberation under G. L. c. 234, § 34. Since § 34 is invoked after a second return, and since the judge expressly stated that the return after note B did not invoke the statute, then the return after note A was the first relevant return. Despite his conclusion that note B did not invoke the statute, however, the judge gave the jury a *Rodriquez*-type instruction without any further instruction on the law, just as he did in response to note A.

cure this error because the jury should never have been in a position to give that consent.

Consideration of the sequence leading to note C reinforces this point. Jury coercion will not always be blatantly obvious, as in the early cases described by the court, where jurors were deprived of food, drink, or sleep to force them to return a verdict. See *ante* at 738. Jurors can be coerced through more subtle means. The *Rodriquez* case illustrates this point, because in that case, this court noted that the "dynamite" type of instruction given by trial judges may result in "undue coercion." *Rodriquez, supra* at 100. Although the court found no coercion in *Rodriquez*, the court saw fit to amend the "dynamite" instruction and to reiterate that it should not be used "prematurely or without evident cause." *Id.* at 100, 101-102. The court did this in hopes that the question of coercion resulting from the giving of this instruction would arise less often. *Id.* at 100.

The subtle, nonphysical coercion that concerned this court in *Rodriquez* is the same type of coercion that I believe was present in this case. To examine whether there was coercion here, we must look at both the notes sent by the jury and the jurors' probable perception of the judge's response to those notes. We should be more concerned with the jurors' probable perception than with the technical legal adequacy of the judge's responses because jurors are drawn from the general public, untrained in the intricacies and complications of the law.

After nine hours of deliberation, the jurors sent note A to the judge, informing him that they had voted three times and that no juror was prepared to change his or her mind at the time. They requested instructions on a continued course of action. I believe that the jurors probably were attempting to indicate to the judge that they were at an impasse, but they did not do so in technical terms. The judge must have seen at least some indication of deadlock in this note because he gave a *Rodriquez* instruction, which is supposed to be given only when there is reason to believe the jury are having

trouble reaching a verdict and never prematurely. *Rodriquez, supra* at 100-101.

The jurors returned to the jury room. Their second note, sent one-half hour later, requested instruction on the possible verdicts in the case, but said nothing more. After three more hours, the jury sent their third note, telling the judge they had voted seven times without reaching a verdict, requesting instruction on "deliberate premeditation," and also asking the judge to *suggest a further course of action.* I believe that here again the jurors were attempting to indicate to the judge that they were at an impasse. As he did after the first two notes, the judge gave instructions and then sent them back.

Only one hour later, the jury sent the judge a fourth note (note B), telling him they had voted eight times this round without reaching a verdict. They indicated that none of them wished to change his or her vote and also wrote that each juror had "expressed [his or her] vote as [his or her] own best decision." The quoted language seems to be a response to the judge's instruction, given after note A, that "the verdict to which a juror agrees must, of course, be his or her own verdict, the result of his or her own convictions or belief." The jurors again asked the judge to suggest a further course of action and also noted that some jurors wanted to be released from the trial. I believe that once again the jurors were attempting to tell the judge that they were at an impasse, and this time they even were attempting to do so in the legal terms which they remembered from his *Rodriquez* instruction. The jurors returned to court and received an abbreviated *Rodriquez* instruction. The judge informed them that jurors would not be released individually. Then he told them, regarding a further course of action, that if there is no "hope of progress" they should tell him. The jurors were sent back out again.

In just fifteen minutes, the jurors sent note C. The jurors now used the judge's own words: "there is no hope of progress." The judge had just instructed the jurors, in accordance with *Rodriquez*, that they should listen to the arguments of

fellow jurors and reexamine their own votes, but if there is no hope of progress, to tell him that. That is what they told him, and I believe that the jurors now expected the judge to understand that they were hopelessly deadlocked and expected that he would release them.

When the jurors got back into court, however, the judge did not release them. He instructed them according to G. L. c. 234, § 34, that he needed their consent to send them back out to deliberate. Not knowing that § 34 is absolute and binding on the judge (they are not lawyers, after all), the jurors heard the judge say, "I would ask you to go up and discuss that matter with a view toward whether or not further deliberations could be fruitful. Write out your answer to me, and at that point *I'll make my decision.*" The jurors were sent out again.

Let us now put ourselves in the position of the jurors. Three times at least the jurors sent notes to the judge indicating that they were deadlocked, yet the judge sent them back to the jury room each time. In the last note, the jurors used the judge's own words to indicate to him that no more progress would be made. They expected to be released, but they were not. Instead, they were sent back to decide whether they should deliberate further. I believe that in the jurors' minds, they already had given the judge the answer to that question in their last note. Furthermore, the last thing the judge said was, "I'll make my decision." If the jurors have told the judge that they could make no more progress and his response was not to release them but to send them out to decide, in essence, if they could make any progress, then at this point the jurors probably did not think that the judge's "decision" would be to release them if they replied in the negative. Although the judge told the jurors that the law said he had to release them if they did not consent to further deliberations, by indicating that he would have a say in the matter, however, the judge gave the jury the impression that they did not in fact hold the key to the jury room lock. See *Commonwealth* v. *Jenkins*, 34 Mass. App. Ct. 135, 144 (1993).

Once again, the jurors were sent to the jury room. It was late in the afternoon on the third day of deliberations. Trial had lasted three and one-half days. These jurors now had served six days on this case and were faced with the possibility of returning for a seventh day. The judge had told them to decide if further deliberations would be helpful even though they had already told him there was no hope for progress, and, moreover, he told them that he would make a decision based on their answer. On at least three occasions they had tried to tell him they were deadlocked, but he kept sending them back for more deliberations. In fifteen minutes, the jurors came back with a guilty verdict. They had not been able to reach any verdict in three days, but now they voted to convict in fifteen minutes. The jurors went from deadlock (notes B and C) to a guilty verdict in only one-half hour, excluding time spent in the courtroom.[3] In the circumstances, I believe the conclusion is compelled that the jurors were coerced into returning a verdict because they did not think they would be released unless they did so.[4] Accordingly, I would reverse.

---

[3]Note C came fifteen minutes after returning to the jury room following the judge's instructions in response to note B, and the guilty verdict came fifteen minutes after the judge addressed the jury in response to note C.

[4]The court surmises that the jury most likely were split over what crime the defendant should be convicted of, and that those jurors holding out for murder in the first degree gave in and voted for murder in the second degree, when faced with the prospect that the defendant might not be convicted and get a new trial. *Ante* at 740 n.5. While jury compromises may be acceptable and often necessary in the rendering of a verdict, the point is that jurors should not be coerced by judges into reaching compromises but instead should do so, if at all, of their own free will.