COMMONWEALTH *vs.* JESUS CARRASQUILLO.

No. 00-P-1476.

Suffolk. December 14, 2001. - April 1, 2002.

Present: RAPOZA, KAPLAN, & BERRY, JJ.

*Evidence,* Prior inconsistent statement, Credibility of witness, Impeachment of credibility, Spontaneous utterance, Grand jury proceedings. *Practice, Criminal,* Grand jury proceedings.

At the trial of charges arising from a street shooting in which the victim testified, inconsistently with his four prior statements and his identification of the defendant in a photographic array, that he could not identify the defendant as the shooter, the judge did not err in admitting, as an excited utterance, the victim's statement at a hospital, made in the course of his excitement engendered by the startling event one hour earlier, that the defendant was the shooter. [367-369]

At the trial of charges arising from a street shooting in which the victim testified, inconsistently with an earlier statement under oath before a grand jury, that he could not identify the defendant as the shooter, the judge did not err in admitting, as substantive evidence, the victim's testimony before the grand jury that the defendant was the shooter, where the victim could be cross-examined at trial regarding the accuracy of his statement to the grand jury, where the statement was not coerced and was that of the victim and not of the interrogator, and where corroboration evidence existed warranting the convictions. [369-371]

Evidence at the trial of charges arising from a street shooting was sufficient to convict the defendant of assault and battery by means of a dangerous weapon and of possession of a firearm without a license, where the judge properly instructed the jury, without objection, how to mark the difference between the victim's statements that were admitted as substantive evidence and those that were admitted for their bearing on the victim's credibility as a witness, and where, by their verdicts, the jury found in effect that the victim's original identification of the defendant as the shooter, rather than his subsequent inconsistent statements, was correct. [371]

INDICTMENTS found and returned in the Superior Court Department on February 23, 1999, and March 18, 1999, respectively.

The cases were tried before *John M. Xifaras,* J.

*Edward B. Gaffney* for the defendant.

Commonwealth v. Carrasquillo.

*Susanne Levsen Reardon*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The defendant, Jesus Carrasquillo, was convicted on criminal charges arising from a street shooting.[1] On his appeal, the defendant contends that the trial judge erred in admitting, as substantive evidence, the victim's statement at a hospital within an hour of the episode that the defendant was the shooter, and again the victim's statement to the same effect in his testimony before the grand jury. We agree with the judge that the statements, over hearsay objections, were admissible as substantive proof, the first statement as an "excited utterance," see *Commonwealth* v. *Zagranski*, 408 Mass. 278, 285 (1990), the second as previous uncoerced sworn testimony by a witness now subject to cross-examination, see *Commonwealth* v. *Daye*, 393 Mass. 55, 67-68 (1984); *Commonwealth* v. *Clements*, 436 Mass. 190, 192-193 (2002). There was other, weighty substantive evidence in addition. We affirm the convictions.

*Narrative.* The following may be accepted as common ground. In early morning of January 24, 1999, around 4:00 A.M., the victim, Tyron Greene, was standing near a pay telephone on Tremont Street at Parker Street in the Mission Hill neighborhood of Boston. A car came by with Greene's long time buddies, the defendant Carrasquillo, also known as "Little Net" and "NeNe," and another youth, called "Migs." The defendant, who was driving, offered Greene a ride home. Greene entered the car, taking the front passenger seat, with Migs remitted to a back seat. As they went east on Tremont Street, Greene took out some marijuana, thirty or forty dollars' worth, and prepared to smoke. Now an argument broke out. The defendant demanded some weed, Greene refused to part with any of it. (The defendant appeared quite drunk and Greene had been drinking at a night club before turning up at Parker Street.) The defendant brought the car to a halt at the corner of Delle Avenue and Bur-

---

[1]Guilty of assault and battery by means of a dangerous weapon (G. L. c. 265, § 15A), possession of a firearm without a license (G. L. c. 269, § 10[*a*]), and unlawful possession of ammunition (G. L. c. 269, § 10[*h*]). The latter conviction was placed on file with the defendant's consent and is not before us. Acquitted of armed assault with intent to murder.

ney Street and, quitting the car, told the two to stay and wait.[2] Greene left the car and waited. He supposed the defendant was going out to get money or weed, but the thought also occurred that the defendant might find a gun, for he was a small man and would need such reinforcement in case of a fight.

In five or ten minutes, a man appeared and came toward the car. Greene approached him within a few feet. The man was holding a gun. Greene turned and ran. He heard five gunshots and a few clicks. He knew he had been shot. Bleeding and in pain, he walked or ran the six or seven blocks to the Brigham and Women's Hospital on Francis Street and was promptly admitted to the emergency room.

We pass from this setting to other testimony of witnesses at trial. Dr. Dan Gurr, chief of emergency service at the hospital, testified he took Greene in hand as soon as he arrived, for he appeared to have a life threatening injury; he was in danger of bleeding to death. Dr. Gurr testified Greene appeared bloody, screaming, upset; he was cold, clammy, sweaty, agitated, trembling, saying a lot of words; it was "a bunch of emotions." Forty-five minutes into it, Greene told Dr. Gurr: "I got shot." Gurr testified, "He said he knew who it was." The bullet had entered the right buttock, traveled into the pelvis, around the hip joint, struck bone and somewhat splintered. Greene was elaborately treated. Hip replacement was first considered, but in the end a lesser operation sufficed.

Sergeant Michael Stratton of the Boston police, responding to calls about the shooting, arrived at the emergency room about 4:30 A.M., as he recalled. Stratton said Greene, trussed up in bed, appeared "in shock," "upset and visibly in pain because every time he would move, he would cringe. His whole face and his whole body would tense up with pain." After getting

---

[2]When arrested on February 10, 1999, the defendant said he lived at 18 Burney Street, apartment 5, and this was confirmed on search of the apartment under warrant that day. Found during the search were a shoulder holster for a firearm and a .38 caliber bullet. (Greene testified he did not see the defendant, on leaving the car, enter a house on Burney Street. He said his look at the weapon in the man's hand suggested a .38 caliber.)

permission from the staff, Stratton talked with Greene.[3] He was "in and out" and "distracted by the pain" as the conversation went on haltingly for five to ten minutes. At first Greene wouldn't talk, but Stratton eased him into speaking by asking a few routine questions. Greene mentioned briefly what happened up to the time he was shot. When Stratton asked him the name of the man who shot him, "he said he didn't know his name, that he knew him as "Little Net." . . . 'I should know him. I grew up with him.' " This statement was admitted as substantive evidence over objection. The ruling was consistent with the judge's finding at a pretrial voir dire that the statement qualified as an excited utterance.

Detectives Robert Kenney and Robert Zingg of the Boston police, who together had participated in investigating the crime on January 24, had the task on February 1 of serving a subpoena on Greene to appear before the grand jury. The officers testified Greene was friendly but reluctant or complaining about having to comply; they told him he had no choice. During the visit, Greene identified Little Net as the shooter; indeed, Greene himself testified at trial he had so identified Little Net during the visit.

On February 3, Greene appeared before the grand jury pursuant to subpoena and told the story of the shooting and again said he recognized the defendant as the shooter. The defendant objected at trial to the introduction of the statement as substantive proof[4] and its admission is the other bone of contention.

On February 5 or 7, Kenney and Zingg went again to Greene's residence and presented him with an array of pictures (all received in evidence). Greene pointed to number 6, depicting the defendant, and by way of identifying the defendant as the shooter, pointed to his buttock; and he put his initials to number 6. He accepted in his trial testimony that he had made this identification.

Greene remained friendly, according to the officers, at their visit on March 5, when he made a sketch of the layout at Bur-

---

[3]According to Dr. Gurr, the staff tolerate such conversation with a patient when it does not interfere with treatment.

[4]In effect, the judge first allowed this testimony de bene and then confirmed its admission in evidence.

ney Street. On July 29, however, he said he would not cooperate and testify at trial. Hence he was given immunity shortly before the date of trial.

Called by the Commonwealth, Greene gave extended testimony, in part as a declared hostile witness. He retold the now familiar story of the meeting, the drive, and the shooting. As to the happening at the hospital, the defendant's counsel elicited from Greene in cross-examination that there were some moments of interval in the conversation with Stratton when Greene might possibly have had time to reflect on his answers. The main feature of Greene's testimony was that he had had, he said, a change of perception. As he was seated next to the defendant during the drive and saw the defendant depart the car, it was natural for him to assume that the man with the gun was the defendant, and so he said in his statements right through his meetings with the police officers. After further thought, however, he realized that he had seen the man holding out the weapon only below his waist. He was now unable and unwilling to make a positive identification. So he explained his turnabout.

But then he testified on a different line, that he was forced into making his grand jury statement. Greene denied he had been in fear of any reprisals by the defendant or the defendant's friends, but mentioned intimidation by the police. If he meant no more than that he had no option but to appear and speak when summoned by the grand jury, as advised by the police, then the supposed coercion came to very little. But he said he was on probation in connection with a drug offense when he attended at the grand jury. Also he said, as to giving up the defendant's name to the grand jury, "that was to get my dignity back so you all can leave me alone." (He said, too, he was anxious about giving testimony at the trial for fear he would wind up in jail, presumably for drug crimes, and so disabled to support his necessitous brother and sister; but as to that he had secured immunity.) The trial judge indicated at sidebar during trial he had considered the question of coercion and was not deterred in admitting the grand jury identifying statement.

*Rulings on evidence.* Greene's testimony at trial that he did not see the shooter whole, and hence could not identify him, may be taken as inconsistent with his prior four statements —

to Dr. Gurr, Stratton, Kenney and Zingg, the grand jury — and his identification of the defendant in the photographic array. (On inconsistency, see *Commonwealth* v. *Daye*, 393 Mass. at 73 n.16; *United States* v. *Williams*, 737 F.2d 594, 608 [7th Cir. 1984].) Eminent scholars and judges have sponsored the view that all such prior inconsistent statements should be admitted as substantive proof, pace general hearsay doctrine. See the discussion and references in *United States* v. *De Sisto*, 329 F.2d 929, 933 (2d Cir.) (Friendly, J.), cert. denied, 377 U.S. 979 (1964). That view has not achieved acceptance in this Commonwealth, and it remains the customary rule that such statements may be received only as means of impeaching the present credibility of the witnesses, not as substantive proof proper (even though the distinction may be lost on some jurors). There are, however, exceptional situations in which the customary rule becomes inapplicable, and two of these occur in the present case.

1. "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" (the short formulation of Fed. R.Evid. 803[2]) qualifies for admission for its substantive content as an exception to the exclusionary hearsay rule — this because it is supposed that a person under stress tends to speak what comes spontaneously to mind, without energy or disposition to invent lies; his excited utterance is likely to be truthful in that sense, and so the hearsay objection is overcome. See *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 222 (1973). See also *Idaho* v. *Wright*, 497 U.S. 805, 820 (1990). Greene appears to have been under continuing stress, physical and psychological, from the moment of the shooting through the period of his encounters at the hospital with Sergeant Stratton and Dr. Gurr. Greene's statement to Stratton — the subject of the defendant's objection — that it should not have been admitted as substantive proof — was uttered perhaps one-half hour or somewhat later after the shooting; the question, however, is not what was the lapse of time between the startling event and the speech, but rather whether the speech occurred in the course of the excitement engendered in Greene by the startling event. See *Commonwealth* v. *Zagranski*, 408 Mass. at 285; *Commonwealth* v. *Brown*, 413 Mass. 693, 696 (1992). The defendant might sug-

gest the excitement ebbed: Greene was stable enough to say at first he didn't want to talk (though this may have been just a reaction to pain); there were moments of hiatus in Greene's speech perhaps allowing for some deliberation; Greene may have made the identification in response to a question rather than as part of a narrative; a motive on Greene's part to implicate the defendant can possibly be imagined. These speculations can detract little from the picture of Greene's predicament as described by Gurr and Stratton. The contrast is marked between the present case and those in which claims of excited utterance have been disallowed. Compare *Commonwealth* v. *Gilbert*, 423 Mass. 863, 871 (1996); *Commonwealth* v. *McLaughlin*, 433 Mass. 558, 565 (2001). At all events, to reverse the judge's ruling on the present record would discount improperly his considerable discretion in such matters. See *Commonwealth* v. *Brown*, 413 Mass. at 696; *Commonwealth* v. *Marshall*, 434 Mass. 358, 363-364 (2001); *Commonwealth* v. *King*, 436 Mass. 252, 255 (2002). The judge did not err in admitting Greene's statement as material proof; its weight was for the jury.

2. Some of those who are unwilling to accept the proposition that a witness's earlier extrajudicial statement, inconsistent with his current testimony, should be received for its substance, are reconciled to the idea there is a difference where the witness made the earlier statement under oath in an official proceeding. The court adopted a rule on such lines in *Commonwealth* v. *Daye*, 393 Mass. at 71, where it was testimony before a grand jury, repudiated by the witness at trial.[5] Recently the rule has been aptly restated in the following passage from *Commonwealth* v. *Clements*, 436 Mass. 190, 192-193 (2002) (grand jury testimony recanted at trial; corroboration by photographic identification): "In *Commonwealth* v. *Daye*, . . . we held that prior grand jury testimony of a trial witness is admissible for substantive purposes provided that certain conditions are met: (1) the witness can be effectively cross-examined at trial regard-

---

[5]The *Daye* rule has been applied also to a witness's prior testimony at a probable cause hearing. See *Commonwealth* v. *Sineiro*, 432 Mass. 735, 744-745 (2000); *Commonwealth* v. *Fort*, 33 Mass. App. Ct. 181, 184-185 (1992); *Commonwealth* v. *Jenkins*, 34 Mass. App. Ct. 135, 145 (1993), *S.C.*, 416 Mass. 736, 741 (1994).

ing the accuracy of the statement; and (2) the statement was not coerced and was more than a 'mere confirmation or denial of an allegation by the interrogator,' i.e., the statement must be that of the witness and not of the interrogator. *Id.* at 73-74. We also required that, apart from these requirements for admissibility of the prior grand jury testimony as substantive evidence, when that testimony concerns an essential element of the crime, the Commonwealth must offer at least some corroborative evidence if there is to be sufficient evidence to warrant a conviction. . . . [T]he first two relate to the admissibility of grand jury testimony, while the third concerns the sufficiency of evidence. Thus, only two factors must be satisfied for the evidence in question to be admitted for substantive purposes. Then, if that evidence concerns an element of the crime, there is a separate require-ment that the Commonwealth must meet to sustain its burden on the element: there must be other corroborating evidence on the issue."[6]

In the present case, admissibility is clear, and corroboration exists in the substantive evidence we have summarized above as common ground, as well as in the substantive evidence of excited utterance. (Greene's photographic identification of the defendant on February 5 or 7, 1999, could count here but it was, too cautiously, received in evidence merely for impeachment.[7] Compare *Commonwealth* v. *Clements, supra* at 194-195.)

The testimony before the grand jury must, of course, have been uncoerced to serve under the *Daye-Clements* rule. Greene's claim to have been compelled against his will to speak as he did to the grand jury has at once the stamp of incongruity, for

---

[6]The court's footnote 3 at this point states: "The additional evidence, however, need not be sufficient in itself to establish a factual basis for each element of the crime," citing *Commonwealth* v. *Noble*, 417 Mass. 341, 345 n.3 (1994), and the *Daye* case, 393 Mass. at 75.

[7]Concluding on the *Daye-Clements* principle, we note that the cognate Federal rule of evidence, Rule 801(d)(1)(A), appears under the caption "State-ments Which Are Not Hearsay," rather than as exceptions to the hearsay rule, and sweeps broadly: a prior statement is not hearsay where the "declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition."

he also said he assumed at the time the defendant was the shooter, and he acted conformably, not only in his grand jury appearance on February 3 but after that session, on the dates February 5 or 7 and March 5; it was on July 29 that he began to be fractious. So on Greene's own terms, he evidently was not put upon on February 3. All this to one side, we think Greene's claim of police intimidation suffers from lack of substantiating detail, as does his reference to probation. Here again it would be hard to charge the judge with abuse of discretion in his evaluation of Greene's condition.[8]

*Conclusion.* The judge instructed the jury, without objection, how to mark the difference between Greene's utterances, those admitted as substance and the rest admitted for their bearing on Greene's credibility as a witness. By their verdicts the jury found in effect that Greene's original identification of the defendant as the shooter was correct. On the whole case there was evidence to convict beyond a reasonable doubt.

Finding no error, we affirm the judgments.

*So ordered.*

---

[8]A minor point. The prosecution was not obliged to accept a stipulation, offered by the defense, that the defendant was known as NeNe and Little Net. It chose, instead, to call Sergeant James Meredith, who testified that in his service on the youth violence strike force in the Mission Hill area in 1993-1994 he learned the defendant was known in the community by those names. The defense contends (although it did not do so at trial) that the prosecutor, by eliciting the reference to the strike force, was improperly suggesting that the defendant had engaged in criminal conduct. The contention is overdrawn, as there was no mention of such conduct on the defendant's part, the reference appears casual or incidental rather than calculated, and if there was error it was minimal in a record of this size and could not have caused any miscarriage of justice.